**BOWLES, Administrator, O. P. A., v. C. S. SMITH METROPOLITAN MARKET CO.**

No. 3429–H Civil.

District Court, S. D. California, Central Division.

March 24, 1945.

H. Eugene Breitenbach, Wm. U. Handy, Stanley Jewell, and Eleanor Shur, all of Los Angeles, Cal., for Office of Price Administration.

Hanna & Morton and Byron C. Hanna, all of Los Angeles, Cal., for defendant.

HOLLZER, District Judge.

This is a suit instituted by the Administrator of the Office of Price Administration for injunctive relief to enjoin defendant from violating certain regulations issued pursuant to the provisions of the Emergency Price Control Act of 1942, 50 U.S.C.A.Appendix § 901 et seq., also to enjoin defendant from violating certain orders issued pursuant to said Act and to direct it to comply with certain provisions of such regulations and such orders.

The complaint consists of fourteen counts, each charging defendant with a violation of one of these regulations or orders or with a failure to comply therewith.

Defendant owns and operates a chain of retail food markets, eleven in number. In each of ten of these markets defendant operates a meat department, a grocery department and a produce department, while in the remaining market only liquors are sold. Most of these markets are located in the City of Los Angeles, while the re-

mainder are situate in adjoining communities.

It is admitted that investigators from the Office of Price Administration, hereinafter called O. P. A., made spot-check investigations in certain of defendant's markets on the dates mentioned in the complaint and that these investigations disclosed violations of the kind described in the complaint.

Shortly after this suit became at issue, counsel for the respective parties stipulated, in substance, that the setting of the cause be deferred for several months, and indicated further that if defendant's markets continued to show improvement with respect to compliance with O. P. A. regulations, etc., corresponding to the degree of compliance then prevailing therein, this suit probably would be dismissed. Accordingly, the trial was postponed. A subsequent investigation having convinced O. P. A. that in several of defendant's markets the percentage of violations had increased, as compared with the conditions prevailing at the time the aforementioned stipulation was made, plaintiff concluded that the suit should be tried. Thereupon a pre-trial was ordered.

At such pre-trial the issues of fact and of law were defined, and counsel for the respective parties outlined the evidence they expected to produce and the contentions they proposed to advance. In addition, defendant demanded that plaintiff participate with it in a joint investigation of prices and O. P. A. compliance in markets competitive with and comparable to the markets of defendant and located in the same areas. Plaintiff having objected thereto, the court ruled that O. P. A. was not required to comply with such demand.

Likewise at the pre-trial, counsel for plaintiff disclosed that it was the latter's practice in cases similar to the present suit to have a further investigation of the markets in question made prior to trial. Such further investigation was accordingly conducted early in January of this year.

To establish its case plaintiff produced as witnesses the several investigators who had inspected certain of defendant's markets during one or more of the periods involved herein. Four investigations in all had been made. The first of these was in November, 1943, the second in March, 1944, the third in June of the same year, and the last during the first week of the present year.

At the close of the evidence, defense counsel stated, in substance, that defendant would concede the correctness of the testimony of plaintiff's investigators relative to the items they checked in the markets inspected, also as to what items they found on their respective investigations and concerning which they had testified. Again, during the oral argument, defense counsel pointed out that while he had produced as witnesses all of defendant's employees whose names had been mentioned in the testimony of plaintiff's witnesses and who were still in defendant's employ, his purpose in calling those witnesses was not to dispute the testimony of the O. P. A. investigators. Rather, stated counsel, his purpose was, firstly, to enable defendant's employees to give such explanations as they had to offer respecting the violations reported and to describe the circumstances under which they worked, and secondly, to enable the court to observe, first-hand, the type of personality and the nature of the ability of the employees upon whom defendant had to rely to effect compliance with O. P. A. regulations.

In view of this state of the record, no useful purpose would be served by any detailed, extended discussion of the evidence introduced on behalf of O. P. A. Instead, we deem it preferable to adopt the summaries, as outlined by plaintiff's counsel during the oral argument, respecting the nature and extent of the violations reported by the O. P. A. investigators based upon the aforementioned investigations.

As thus reported, the November, 1943, investigation disclosed, among other matters, that out of a total of 120 items checked in the grocery departments of all the markets visited, 34—about 28% of the items inspected—were found to be priced over ceiling. However, it should be noted that the range of these particular violations varied from a minimum of about 10% in one market to a maximum of about 60% in one of the others. Again, the ration violations for the same period ranged from approximately 4% in one market to about 28.5% in another.

With respect to the meat departments inspected during the same period, the range of price violations varied from none in three of the markets and 8% in the next lowest to a maximum of 28.57% in still

another market. Furthermore, the violations based on failure to tag meat ranged from none in four of the markets to 12.5% in the market having the next lowest number and to a maximum of 89.28% in one of the other markets.

As to violations of meat rationing, three of the markets showed no offering of rationed meat without the proper point value, while the other markets showed violations ranging from a minimum of 3% to a maximum of about 15%. In two of the markets the reports showed no violations involving failure to post ration point value, while in other markets such violations ranged from 5% to about 89%.

The reports covering the March, 1944, investigation showed a decided improvement with respect to compliance with O. P. A. regulations. Seven markets were inspected. Out of a total of 1,280 items then checked in the several grocery departments, only 46 or about 3½% were found to involve a price violation. The lowest percentage of violation in any single market was 1.28, while the highest was about 7%.

In the meat departments of some of the markets no meats were being offered in excess of ceiling price, while in the remainder the investigator rarely found more than two or three items involving a violation.

Referring to the June, 1944, investigation, counsel for O. P. A. pointed out that the grocery departments were not in very bad shape, although the percentages of price violations had increased as compared with the preceding investigation. Five markets were inspected. Out of a total of 1145 items checked, 56 or about 5% involved a price violation. The percentage of such violations varied from 2% in one market to a maximum of about 10%. Here it should be noted that the range of these percentages was much lower both in March and June, 1944, than in the preceding November.

However, in the meat departments of these same markets the reports showed a marked increase in the percentage of violations, as compared with the preceding inspection. Out of a total of 202 items checked, 57 (or about 28%) were found not tagged as to price. The lowest percentage in any one market was 12, and in the highest was 43. Again, out of 180 items checked as to price, 43 (or about 24%) were being offered at excess of ceiling price. The lowest percentage of such violations in any one market was 5 while the highest was 29.

Likewise, out of a total of 65 items checked, 33 or approximately 50%, were not posted as to grade, the variations ranging from 27% upward. In addition, while in one market there was no upgrading of meat, the remaining four markets did show violations of this type. Out of a total of 65 items checked 21, or about 32%, involved such violation. With respect to ration points, only two of these markets were selling rationed meats, and out of 8 items checked, 2 or 25% were being offered at incorrect ration points.

In the produce departments of these markets, out of a total of 80 items checked 6, or about 8%, involved a violation. However, in three of these markets the produce departments showed no violations.

We turn now to the investigation made early in January of the present year. Four markets were inspected. As pointed out by counsel for O. P. A., in spite of the fact that numerous ration point changes had been made shortly prior to this investigation and in spite of difficulties then being experienced in obtaining the necessary charts from O. P. A., the percentage of compliance with O. P. A. regulations at defendant's markets was startlingly good. For example, in the several grocery departments inspected, out of a total of 638 items checked only 11—about 2%—were found not to be posted as to price, while 6 items—less than 1%—were being offered at prices in excess of ceiling. "We could consider them in good shape in markets", observed counsel for O. P. A., "when they had a three-point percentage as to price."

Again, out of a total of 238 rationed items checked in the several grocery departments only three—about 1%—were not posted as to ration points, while 32 items—about 13%—were being offered at incorrect ration points. "We considered that percentage rather good under the circumstances," said O. P. A. counsel.

In the meat departments, out of a total of 75 items checked 4, or less than 6%, were not posted as to price. This compares quite favorably with the conditions found in November, 1943, at which time the percentage of such violations amounted to 28. Here it should be noted that in

three of the four markets investigated no such violation was found. In one market no violations respecting meat were reported, while in two of the markets the violations found pertained only to lack of posting.

With respect to pricing over ceiling, one of these markets showed no violation, in another market one violation was found, in another there were two such violations and in the remaining one three were found.

As to posting ration points on meat, in one market no violation was found, in each of two markets there was one such violation, while in the fourth market two violations were reported. Again, in one market there was no violation with respect to offering meat at the proper ration point value, also in one market one violation of this type was found, in another market there were five such violations, while in the fourth there were nine violations.

In the produce departments of these same markets, out of a total of 66 items checked only four were being exhibited without posting and only two were being offered at prices in excess of ceiling.

We come, now, to a consideration of the defense. It is contended by defendant that at all times it has acted in good faith and has exercised diligence and every reasonable effort to effect compliance with O. P. A. regulations and orders. Defendant further asserts that such violations as have been committed by its employees have been involuntary and comparatively few, considering all the conditions and circumstances involved; also that such violations as have occurred are attributable, primarily, to conditions and circumstances over which defendant has had no control, but which have been produced by the war, and in part are due to difficulties encountered in interpreting regulations and orders, misunderstanding thereof, confusion on the part of employees neither trained nor experienced in such problems, the fallibility of humans, and occasionally because of delay on the part of O. P. A. in furnishing copies of the pertinent regulations and orders. Accordingly, defendant urges that the issuance of an injunction or any other order would have no effect by way of insuring better compliance in the future, and also would be unjust to it and not in the public interest. Hence, it is argued, this cause should be dismissed.

In support of these contentions, rather voluminous documentary material has been introduced in evidence, and in addition defendant has called to the stand its President, its General Manager, its Field Manager in charge of Personnel, the respective Supervisors of its meat, grocery and produce departments for all of its markets, and also all of its clerks and market department managers and assistant managers still in its employ and to whom reference had been made in the testimony of the O. P. A. investigators. Two office assistants employed at defendant's central office also have testified. One of the latter usually telephoned weekly to O. P. A. for information respecting changes in requirements prescribed by the latter, while the other had charge of checking invoices of merchandise bought, kept records of defendant's ration bank account and also checked through correspondence the market department managers respecting compliance with O. P. A. requirements.

As shown by the testimony of its General Manager, for years prior to our entry into this war defendant had had what is termed as a central pricing system. Under this system defendant's central office maintained a loose-leaf book containing the prices of all articles sold in any of its markets, and a new sheet was made as often as the price of an article changed, each store being furnished with a duplicate of such price book and of all new pages showing changes. The frequency with which price sheet changes were made and distributed to the several markets varied from three to six days per week. However, with the inception of O. P. A. regulations, meat prices and ration point values for the same were listed exclusively in O. P. A. charts.

At least 5,000 different articles are carried in defendant's markets and are listed in such price book. The number of customers buying in defendant's markets averages 450,000 per month and the sales average $350,000 monthly. The total number employed in all of the markets and central office combined averages about 225. Ever since the entry of the United States into the war there has been a very large turnover amongst its employees. For example, in the year 1944 the number of employees who were discharged or who quit to enter the military service or to engage in some other work totalled 677. (See Defendant's Exhibit NN).

Again, during the period extending from October, 1942 to the time of trial, seventeen different grocery department managers and nine different meat department managers had been employed at one of defendant's markets. (See Defendant's Exhibit OO). While it is true that these particular changes represented the largest turnover of employees within the categories mentioned, the seriousness of such labor problem is further illustrated by the testimony of a former employee of defendant, who, though subpœnaed by the plaintiff, was called to the stand by the court. This witness testified, among other matters, that he had been employed by defendant as an apprentice meat cutter from June or July, 1943, to March, 1944, also that he received a salary of $37.50 per week for the first six weeks and a salary of $42.50 per week during the balance of such employment. He further stated that he was sixty-three years of age, that his experience as an apprentice meat cutter began about September, 1942, and that prior thereto he had worked in the cleaning business and also as a salesman. He further disclosed that since leaving defendant's employ about March, 1944, he had worked for at least seven different employers, having started at his current job only a week previously.

Defendant maintains an O. P. A. Compliance Department, consisting of its General Manager, its several supervisors and three additional employees. This General Manager visits each market at least once every week. Since the inception of O. P. A. he has worked every day, including Sundays and holidays, from 8 A. M. until midnight, without a vacation, except for an occasional absence of not exceeding three days at any one time. Meetings of grocery department managers are held seven to eight times during the year at the central office. These meetings occupy about one hour and most of the discussions pertain to O. P. A. regulations, orders, etc. All managers are instructed to adhere as closely as humanly possible to all O. P. A. regulations, orders, etc. Numerous bulletins are issued to various managers from time to time calling attention to such regulations, etc. (requiring doing of a multiplicity of acts involving a great deal of detail) and admonishing such managers to comply with the same.

Illustrative of such multiplicity and detail is the fact that O. P. A. schedules governing price changes with respect to produce, eggs and fish are issued on an average of at least once every week. Referring to the difficulties arising out of such conditions counsel for O. P. A. during the oral argument commented: "I don't think we have ever controverted that there was a multiplicity of regulations issued and that there was a considerable problem in educating the American public and the American merchandiser to price control. As a matter of fact, rationing of meat first came in in 1943 or thereabouts, and to adjust the minds of the seller and the buyer to the problem would take a lot of education, both by the central offices of various corporations for their salesmen, and by our office."

It further appears from the testimony of defendant's General Manager that, with the exception of two grocery items priced over O. P. A. ceiling at the time of the November, 1943 investigation,—one of which errors was corrected virtually immediately—and the other shortly after the same was called to the attention of defendant's central office—every grocery item and every produce item reported in any of the investigations as having been posted or quoted at a price in excess of ceiling was found to have been correctly priced in the central office price book, a copy of which is furnished to each of the markets. In other words, with the minor exceptions aforementioned, the errors complained of had been committed by employees in the different markets.

The same witness testified that certain of the violations reported by O. P. A. officials had been committed on the very day on which certain O. P. A. price or ration point changes had become effective, while other violations had occurred within a short time after rather extensive modifications of this nature had been ordered. He further stated that up until about two weeks prior to the trial the O. P. A. weekly charts effective each Thursday 8 A. M., listing the community ceiling prices on produce, bore a postmark showing the same to have been mailed on Wednesday evening, with the result that such charts were received by defendant usually on Thursday afternoon and sometimes not until Friday and even later.

One of the alleged violations pertained to the sale of grapefruit, which had been wrapped when purchased by defendant and

sold by it with the wrapper removed and which was displayed in the same box with the wrapped grapefruit. Here it should be noted that the O. P. A. order governing the sale of such fruit was so phrased as to justify the practice followed by defendant. In fact, this order proved to be impracticable and accordingly was rescinded.

Another violation involved the sale of carrots in bunches displayed as weighing one pound each and which the investigator found in one of defendant's markets weighed less than the prescribed weight in a number of instances. On the other hand, the evidence further showed that all carrots sold by defendant were purchased packed in large crates with the carrots already bunched and represented to weigh one pound per bunch. Furthermore, with the exception of the incident last mentioned, defendant's General Manager stated he had never heard that any bunches of carrots were under weight.

That violations of O. P. A. regulations, orders, etc., have been and still are committed from time to time in defendant's markets is not seriously controverted by defendant. Indeed, the President and the General Manager of defendant, and likewise every one of its supervisors, admitted discovering some violations during at least most, if not all, of the occasions when they inspected the markets. However, defendant insists that it has done and is continuing to do everything humanly possible to effect full compliance with the law, including O. P. A. regulations, etc.

On one occasion the General Manager uncovered a situation which indicated that one of the meat department managers was surreptitiously delivering meat to a restaurant without obtaining the requisite ration points. This violation, he stated, was reported to O. P. A. This testimony was corroborated by that of the President of defendant. On another occasion this witness learned that a butcher and a cashier at one of its markets were engaged in a scheme whereby grocery sales were recorded as meat sales in order to increase the receipts of the meat department and in turn increase the bonus paid as part compensation to the butcher. Still another instance involved a liquor department employee and a cashier in a scheme whereby a fictitious grocery sale was recorded so as to enable the cashier to steal the liquor.

In support of defendant's claim that it applied all practicable measures to effect compliance with O. P. A. regulations, etc., the General Manager called attention to one of the printed signs, which he stated had been kept posted during the past year and a half, prominently displayed in each of defendant's markets. According to this witness, defendant's markets were the first to post such a sign, and comment respecting the same appeared in the grocers' trade journal known as "Commercial Bulletin". One of these signs was introduced in evidence (see Defendant's Exhibit "A") and read as follows:

"IT IS THE DESIRE OF ALL
C. S. SMITH MKTS.
    TO COMPLY 100%
WITH ALL OPA
    REGULATIONS!

"We Ask Your Cooperation In Helping Us During This Emergency—

"If it appears, at any time, that any of the items on our grocery shelves—on our vegetable stands—or in our meat counters are priced above O. P. A. ceiling or marked with the incorrect number of ration points per can or per pound, please call it to the attention of the store manager and the necessary corrections will be made immediately.

"For Your Information All Smith Markets Are In 'O. P. A. Classification No. 4–A'

                    Sincerely
"A. L. Hollingsworth       Carl D. Flinn
  "Store Manager       General Manager."

As further evidence of defendant's policy of cooperation with O. P. A., and particularly to prevent inflation, the General Manager pointed out that it was defendant's regular practice to sell approximately 5% to 8% of its items, generally leaders, at less than O. P. A. ceiling prices, and that the sales of these items probably exceeded that percentage of the total dollar volume. This testimony was corroborated by that of the President of defendant.

The testimony of the President of defendant disclosed that he had been engaged in the retail grocery and meat business for more than twenty-five years. He further stated that since long before the war he has devoted all of his time to the operation of defendant's business, except from about December 7, 1941, until June, 1943, when he was called to active military duty as Commanding Officer of a regiment, which he organized as a part of the State

Guard of California, and that during the last year of such military service he devoted one or two days a week to defendant's business.

This witness likewise testified that from its inception he had taken the position that O. P. A. was one of the most necessary functions of government, and that it always had been defendant's policy to uphold and to comply with its regulations, etc. Referring to one of the measures taken to secure compliance with such regulations, etc., he stated that he had employed investigators to check defendant's markets in an effort to discover weak points with respect to O. P. A. compliance and to effect corrections where possible. Such investigations, he added, had been conducted without the knowledge of any of defendant's employees, including its General Manager.

He further asserted that during the past year he had visited each of defendant's markets on an average of more than once a week, and that during the same period he had attended probably four or five of the meetings held with the store managers. Practically the entire time of such meetings, he added, had been devoted to the discussion of O. P. A. compliance. According to his estimate, each of defendant's markets carried a stock of merchandise comprising more than 5,000 different items and averaging about twenty articles of each item.

As an example of some of the difficulties he claimed defendant had encountered, he pointed out that in normal times the staff for the average grocery department of one of defendant's markets consisted of an experienced manager, also an experienced assistant manager, together with three or four experienced clerks, occasionally only two clerks—depending upon the size of the market—whereas during at least the past year and a half these markets had been subjected to a very large turnover among the employees in all departments. In fact, he asserted that defendant had been able to maintain a nucleus of only 20% or 25% of its old experienced help.

In this connection he stated that, although defendant had succeeded in maintaining a quota of about 90% of the total number employed prior to the war, the frequent changes aforementioned left defendant with employees who, for the most part, were inexperienced and incompetent. As an additional illustration of this prob-

lem, he cited the experience encountered in one of the markets where, during the last five months, eight different persons had been employed as assistant manager. Three of these, he said, had been discharged for drunkenness, two others for stealing and the balance simply had failed to report for work. He further asserted that, whereas prior to the war all of defendant's employees—excepting the cashiers—had been men, most of the help now consisted of women, virtually all of whom were inexperienced and incompetent.

Likewise, according to the testimony of defendant's President, up until the entry of the United States into the war, meetings of store managers had been held weekly, while the meat department managers had met every other week. Contrasted to such former practice, and solely because of the radical changes produced by the war, the number of store manager meetings had been reduced by more than one-half and the meat department managers had met only once during the past two years. From time to time during that period he said that grocery and other department managers had complained to him that owing to changed conditions they were unable to keep the merchandise properly marked or tagged, but nevertheless, they tried to do so in some way or another. He further claimed that, as a consequence of the changed conditions, including the frequent turn-over among employees, their lack of experience and incompetence, the new regulations and orders, more or less numerous, complicated and confusing, defendant had had trouble operating each of its departments. This had been particularly true as to the meat departments. Cutting meat, grading the same, and the ability to distinguish between the various cuts of meat, all required considerable experience and fairly expert knowledge. Frequent changes among the employees in this department, plus great difficulty in securing sufficient quantities of meat, further complicated the problem of operating such department. As pointed out by this official, the supervisor of all of defendant's meat departments spent about 80% of his time driving a truck from packing house to packing house, buying meat wherever he could obtain the same and delivering his purchases to the various markets.

To illustrate the difficulty in obtaining competent meat cutters, this witness stated that not infrequently about the time

such an employee demonstrated his ability, he would be tempted to quit and take a job with a competitor at a greatly increased wage. When asked whether such practice could not be prevented by refusing to issue an availability certificate to the employee involved, this official replied that for a time defendant endeavored to put pressure on such employee to induce him to remain, whereupon the meat cutter threatened to cause sales to be made above ceiling price and without collecting the requisite ration points and then have the same reported. Accordingly, after bad experiences of this kind, defendant issued the availability certificate whenever the employee insisted. In this connection, the witness pointed out that many meat cutters had informed him that the government's wage stabilization order was evaded by having the employer issue a check for the legal wage and then surreptitiously place the excess in the form of currency in the employee's pocket.

Another device for paying illegal wages, he explained, was the practice whereby the owner of a market employing more than eight persons would ostensibly sell the meat department to a meat cutter and guarantee his accounts with the packing house, so that to all intents and purposes he was in business for himself, and thereby such meat cutter would be enabled to secure an increase in compensation.

In addition to the foregoing evidence, defendant called to the stand all those still in its employ who had been mentioned by any of the O. P. A. investigators, also two of its office staff together with the respective supervisors of its meat, grocery and produce departments. With the exception of the office staff whose testimony pertained to other matters, each of these witnesses claimed that the violations reported by O. P. A. were occasioned by inexperience, or by inadvertence, or by lack of sufficient experienced help, or by delay in receiving notice of changes of O. P. A. regulations, etc. Likewise, all of them insisted that whatever mistakes they had made were unintentional.

The supervisor of defendant's meat department testified, among other matters, that most of defendant's difficulties in securing compliance in its meat departments with O. P. A. regulations, etc., arose primarily out of its inability to secure and retain competent help in such departments. Whereas before the war defendant had employed, he stated, from 30 to 35 meat cutters, this number had been reduced to a maximum of 14 during the past year and a half.

He further asserted that he customarily telephoned to the local butchers' union three or four times a week, asking for help. He also said that he had been present when offers had been made to some of defendant's butchers to pay the latter ten or fifteen dollars higher wages per week, with the result that such employees quit their jobs. Only a few of defendant's butchers cooperated voluntarily. There were also instances, he claimed, when employees objected to his methods of supervision and quit their jobs, because he insisted that they comply with O. P. A. regulations, etc.

Likewise this witness stated that he had found it necessary to cut meat in some of defendant's markets about three times a month and in fact operate some of the meat departments. He admitted, however, that this had not occurred within the past two months. He also conceded that he found mistakes in the meat departments very frequently, but insisted that he corrected them before leaving the market involved. He further claimed that he visited each market practically daily. On the other hand, he testified that whereas before the war he had been able to order meat over the telephone, after visiting the packing house to select the cattle, and to have such meat delivered to defendant's markets by the dealer, the changed conditions produced by the war made it necessary for him to make frequent trips to several packing houses, there to gather up such quantities of meat as he was able to buy, and then deliver the same in a truck to defendant's markets. These new conditions, particularly gasoline rationing and insufficient competent help, he insisted, made it necessary to discontinue the meetings with the meat department managers.

According to the latter's testimony, it was necessary for him to humble himself to many of defendant's employees in order to induce them to remain in its employ and to comply with O. P. A. regulations, etc. As an example of this practice, he asserted that, whereas before the war if he had caught an employee smoking behind a meat counter he would discharge him, he now brought cigarettes to the employees. The same witness declared that at times when O. P. A. ordered changes in point values or ceiling prices defendant had encountered difficulty in obtaining copies of the official

charts specifying such changes. To substantiate this claim, defendant introduced in evidence a document issued by an O. P. A. War Price and Rationing Board under date of December 4, 1944, which instrument stated, in substance, that defendant had applied to said office to obtain point value charts, which said office had been unable to supply, because of inability to obtain same. (See Defendant's Exhibit JJ.)

The remaining department supervisors employed by defendant testified, in substance, that they visited all of the markets, either daily or at least every other day, and carefully observed the operation of the respective departments of which they were in charge. While admitting that from time to time they found some situations involving violations of O. P. A. regulations, etc., each insisted that all practicable measures were being taken, and that every reasonable effort was being made, to secure full compliance with such regulations, etc.

Counsel for O. P. A. attack the credibility of nearly all of defendant's witnesses and insist that the latter showed bias and sought to give only such testimony as would tend to excuse their infractions of the regulations, etc. We are inclined to agree that the great majority of defendant's employees who appeared at the trial not infrequently offered lame excuses and gave rather unsatisfactory explanations as to the causes of various violations of the regulations, etc.

Likewise, we think that, in view of the fact that the supervisor of defendant's meat departments devotes about 80% of his time to buying and delivering meat, and considering the further circumstances that but one meeting of the meat department managers has been held during the past three years, it is highly doubtful that these departments receive adequate or proper supervision. Again, the large turnover among defendant's employees, their lack of experience and incompetence for the most part—even granting that defendant has no control over these conditions and that the same are unavoidable because of the war—all would seem to require more frequent and more thorough supervision than presently is being given to these markets. In this connection it should be noted, as previously observed, that the defense does not question the correctness of the substance of the reports as submitted by the O. P. A. investigators.

That there is a wide divergence between the contentions of the respective parties, not only as to the inferences to be drawn from the evidence, but also respecting the legal conclusions to be deduced therefrom, cannot be gainsaid. However, as we appraise the record presented here, we are persuaded that there is no substantial controversy respecting factual issues, with the exception of the matter of supervision of defendant's employees, including the character, extent and adequacy thereof.

■ While we agree that the major percentage of the reported violations—certainly the more serious ones—occurred in the meat departments of defendant's markets, we cannot accept the inference that such violations were deliberate or willful. Rather are we satisfied that the same were attributable to inexperience or incompetence or carelessness, or possibly to all of these deficiencies on the part of these employees.

On the other hand, plaintiff's counsel concede that defendant's President testified truthfully and accurately and that his credibility is not questioned. Here we deem it appropriate to add that, except where defendant's President and also its General Manager testified to matters of opinion or in the nature of conclusions, we are persuaded their evidence should be treated as proving the matters concerning which they testified. Furthermore, we believe that these officials and also defendant's supervisors have been willing at all times to cooperate with O. P. A. Likewise, we think undue emphasis has been placed upon some of the reported infractions, particularly those involving the sale of grapefruit, also the sale of carrots, and those occurring on the very days when various O. P. A. price or ration point changes became effective. Again, we are persuaded that some of the claimed violations were occasioned, at least in part, by the tardiness of O. P. A. in supplying applicable charts.

■ We are equally convinced that none of defendant's officials, including its supervisors, consented to any of the violations reported herein and that, on the contrary, the same were committed without the knowledge of such executives and contrary to their instructions. We do not have here a situation such as sometimes occurs where there has been a continued attempt to circumvent O. P. A. regulations, or where there has been utter disregard thereof with a studied attempt to take matters

into one's own hands. Nor can it be said upon the evidence before us that O. P. A. has sought without avail to compel defendant to comply with its regulations, etc., and that these efforts have been met with recalcitrant non-compliance. As to defendant's good faith we have no doubt.

The Supreme Court in Hecht Co. v. Bowles, 321 U.S. 321, at page 329, 64 S. Ct. 587, at page 591, 88 L.Ed. 754, declared: "We are dealing here with the requirements of equity practice with a background of several hundred years of history. Only the other day we stated that 'An appeal to the equity jurisdiction conferred on federal district courts is an appeal to the sound discretion which guides the determinations of courts of equity.' Meredith v. City of Winter Haven, 320 U.S. 228, 235, 64 S.Ct. 7, 11 [88 L.Ed. 9]. The historic injunctive process was designed to deter, not to punish. The essence of equity jurisdiction has been the power of the Chancellor to do equity and to mould each decree to the necessities of the particular case. Flexibility rather than rigidity has distinguished it. The qualities of mercy and practicality have made equity the instrument for nice adjustment and reconciliation between the public interest and private needs as well as between competing private claims."

Again, as pointed out by our Ninth Circuit Court of Appeals in its recent decision of Bowles v. Huff, 146 F.2d 428, 430, the matter of judicial discretion in the granting or withholding of injunctive relief was the subject of discussion in the aforementioned decision. "In the Hecht case," said the Court of Appeals, "numerous violations both as respects prices and records, were discovered. But the record in that case convinced the Supreme Court that the defendant, the Hecht Company, had displayed good faith and diligence in trying to correct the condition complained of. * * * Commenting on the seeming man-

datory character of § 205(a), (Emergency Price Control Act of 1942 [50 U.S.C.A. Appendix § 925(a)]) the Supreme Court said:

" 'We agree that the cessation of violations, whether before or after the institution of a suit by the Administrator, is no bar to the issuance of an injunction under § 205(a). But we do not think that under all circumstances the court must issue the injunction or other order which the Administrator seeks.' "

Again, in the Huff case, the court observed: "Good faith of the parties may not be decisive, but on the other hand, if made manifest, it may be a substantial element to be considered in an equity case. An equity court has the power 'to mould each decree to the necessities of the particular case.' Obviously, its decision in 'any particular case' need not and should not tie its hands in the disposition of a subsequent case revealing a different state of facts calling for entirely different action."

To the same effect, see Bowles v. Minish, D. C., 56 F.Supp. 153 and Bowles v. Egbert, D. C., 55 F.Supp. 970.

Applying the principles expounded in the cases above cited, our survey of all the facts and circumstances presented in the record before us convinces us that the issuance of an injunction, in other words the granting of the maximum relief which may be awarded herein, is not required in the instant suit. Rather are we satisfied that some other order would be "more appropriate for the evil at hand than the one" sought by plaintiff. Accordingly, we conclude that the order which should be entered herein is one requiring defendant to provide additional supervisors for its markets. The time within which such additional supervisors shall be secured shall be specified in the findings and decree to be hereafter signed.