## BOWLES, Price Administrator, v. W. W. ELZEA, Inc., et al.

District Court, S. D. New York.

April 2, 1945.

John D. Masterton, Chief Enforcement Atty., of New York City (Edward S. Schubert, Enforcement Atty., Paul L. Ross, Regional Enforcement Executive, Elliott L. Biskind, Chief, General Litigation Branch, Regional Litigation Section, and William Sardell, Acting Litigation Atty., all of New York City, on the brief), for plaintiff.

Thomas Keogh, of New York City (Joseph L. Maged, of New York City, of counsel), for defendant W. W. Elzea, Inc.

Maurice L. Albert, of New York City, for defendants Llewellyn Watts and Llewellyn Watts, Jr., etc., Weinberg Butter & Egg Co., Inc., J. R. Kramer, Inc., and William Menzer, Inc.

Davies, Auerbach, Cornell & Hardy, of New York City (J. W. Burke, Jr., of New York City, of counsel), for defendant Zenith-Godley Co., Inc.

Sidney Schwartz, of New York City, for defendants Fabian J. Doscher, doing business as John Doscher & Co., Charles Wheeler et al., and Charles E. Krasnoff.

Herman S. Wolfman, of Jamaica, N. Y., for defendant Irving Fuchs.

BRIGHT, District Judge.

These ten actions were brought pursuant to Section 205(a) of the Emergency Price Control Act of 1942, 56 Stat. 33, 50 U.S.C.A.Appendix, § 925(a), on almost identical complaints, alleging that each of the defendants, during the period from June 19, 1944, to the date of the complaint, had accepted delivery of or offered to buy or accept delivery of, sold and delivered, and offered to sell and deliver, butter at wholesale prices in excess of the maximum prices established by Maximum Price Regulation No. 289 as amended. A permanent injunction is asked restraining each defendant from selling, buying or accepting delivery of butter (1) at prices in excess of maximum prices established by the regulation as heretofore or hereafter amended, and (2) unless defendant prepares and keeps available proper invoices, books and records in accordance with such regulation; (3) from performing or omitting to perform any other act in violation of the regulation; and (4) from evading, either by direct or indirect methods, the price limitations set forth in the regulation. Motions for preliminary injunction were made, but in view of the sharp conflict of evidence, their decision was held in abeyance pending the determination of the general issue. The cases were tried together under stipulations that evidence in any might be availed of in the others.

No question is raised in any case with reference to the Emergency Price Control Act, or the regulation in question, or the terms of either, or as to the maximum

prices established. As I see the cases, after hearing the proof and reading the briefs, there seem to be three questions to be decided—(1) whether the gradings of butter by plaintiff's witness should be accepted as against those testified to by defendant's witness, (2) did defendant act in good faith and without intent to violate the regulation, and (3) does plaintiff come into court with clean hands, in view of the instruction that the butter grader and plaintiff's investigator should not reveal to defendants the grade fixed after inspection of the butter, and their refusal to reveal such grade upon defendants' request?

The regulation in question, so far as material and applicable to butter, a "listed dairy product", provides:

"Sec. 3. Prohibition against dealing in listed dairy products above maximum prices. (a) On and after December 30, 1942, or the effective date of any amendment fixing maximum prices * * * regardless of any contract, agreement, or other obligation, no person shall sell or deliver a listed dairy product, and no person in the course of trade or business, shall buy or receive a listed dairy product at a price higher than the maximum price permitted * * *, and no person shall agree, offer, solicit, or attempt to do any of the foregoing."

"Sec. 5. Records and reports. (a) Every sale of a listed dairy product * * * shall be invoiced by the seller. The original invoice shall be delivered to the buyer and shall state (1) the date of purchase, (2) the names and addresses of the buyers and sellers, (3) the quantity, grade, and type of package of each listed dairy product sold, (4) the price, per unit of sale and in total, and (5) the geographical place for which the price is calculated.

"(b) Every buyer of any listed dairy product shall preserve for inspection by the Office of Price Administration for so long as the Emergency Price Control Act of 1942, as amended, remains in effect, the original * * * of each invoice required to be furnished by paragraph (a) of this section."

"Sec. 20. Maximum prices for butter— * * * (i) The maximum price for bulk butter of the following scores or grades delivered to the cities of Chicago * * *, New York, and San Francisco, shall be as follows:" (Then follows a tabulation respecting the three cities mentioned, the

prices depending upon whether the butter is U. S. grade AA or U. S. score 93, grade A or 92 score, grade B or 90 score, grade C or 89 score, cooking grade, or no grade, and also depending upon the nature of the container, wrapping, and form.)

Under definitions, it is further provided:

"(2) Score or grade of butter. 'Score or grade of butter' means the quality of butter determined in accordance with the Official United States Standards for U. S. Grades of Creamery Butter issued in January 1943 by the United States Department of Agriculture and effective February 1, 1943."

On June 14, 1944, the War Food Administration issued a bulletin upon the subject of the procedure to be followed in handling butter grading for the OPA enforcement section, under which, in substance, the grader so assigned was required to accompany the OPA investigator, to grade the lots designated, issue a covering certificate for each lot graded complete in every detail, including kind and condition of the packages, the OPA to be shown as the applicant, and other information if required. It further provided:

"Information concerning the results of the grading shall be kept strictly confidential by the grader and will be made available only through issuance of the covering certificate to the applicant. No comments of any kind are to be made by the grader concerning regulatory phases of the OPA program. Any inquiries from the trade in this regard must be referred to the OPA. * * * It is imperative that these instructions be strictly adhered to. Grading performed is at the request of a Government agency."

The proof shows that in each of the instances in question the grader of the Department of Agriculture accompanied an OPA investigator to the place of business of each defendant or to the place where the defendant's butter was then deposited. The butter was there graded, and the result of that grading was placed in a certificate issued to the OPA. In every instance, as instructed, the grader and the investigator, if requested by any defendant, refused to divulge the grade of the butter as determined by the grader, or to deliver a copy of the certificate.

Grading is done by inserting into the butter a trier (which is a semi-circular metal instrument, 12 or 15 inches in

length), and withdrawing a plug of butter. The grader tastes a portion of that butter to determine its flavor, the particular body character is observed both for color and otherwise, and by feeling is ascertained any defects as to grittiness, mealiness, etc. There are some fifty classifications of flavors, and many more for defects in body, color and salt. These classifications were promulgated and fixed by the Department of Agriculture as standards for grades of creamery butter, effective February 1, 1943; and depending upon what is found by taste, smell, sight and feeling, the particular grades are assigned by the grader. The butter is supposed to be graded under favorable conditions as to temperature of the product and of the room where graded. It is admitted that different graders may vary in the grades assigned to any particular lot of butter, but it was shown that an effort is made to accomplish uniformity. The butter industry relies upon the grading by the Department of Agriculture and their graders are frequently called in to determine disputes. Obviously, the grading is a fine art, particularly in view of the fact that there is not a sharp difference between grades AA and A, and with reference to other scheduled qualities. An appeal may be taken from the action of any grader. In these instances, defendants had no opportunity to appeal because they did not know what the grades were, and were not furnished with copies of the certificates. It is undisputed, however, that they did know that an investigation by the OPA was then being conducted in the butter industry, and that each of them could avail itself of a grading by the Department of Agriculture grader upon request. The proof shows that in no instance did defendant make any such request.

The general case applicable to all defendants consisted of the text of the maximum price regulations in question, the standards for grades of creamery butter prescribed by the Secretary of Agriculture and effective February 1, 1943, the rules and regulations of that Secretary governing the sampling, grading, labeling and packaging of butter and other products effective January 2, 1942, and testimony showing the manner in which butter was graded by official graders of the Department of Agriculture. Plaintiff's direct proof in each specific case was almost entirely documentary. Certificates of an official grader were introduced showing the grades determined by him as to each of the inspected shipments of butter received by a particular defendant, together with a stipulation of the parties identifying such shipment with the certificate, specifying the creamery from which received, and the prices paid by each defendant therefor. Each of the several shipments examined consisted of a number of packages plainly marked with a churn number given by the manufacturer, and from each churning a sample of butter was taken and graded, and the result tabulated in the certificate. In practically every instance it was thus shown that the defendants had purchased and paid for the butter at prices in excess of the maximum prices fixed by plaintiff's regulations for the grades determined by the Department grader.

This proof presented a prima facie case for the plaintiff. Section 414 of Title 7 U.S.C.A., so far as applicable, reads:

"The Secretary (of Agriculture), independently and in cooperation with other branches of the Government * * * is authorized to investigate and certify to shippers and other interested parties the class, quality, and condition of * * * butter * * * when offered for interstate shipment or when received at such important central markets as the Secretary may from time to time designate * * * under such rules and regulations as he may prescribe * * *: Provided further, That certificates issued by the authorized agents of the Department shall be received in all courts of the United States as prima facie evidence of the truth of the statements therein contained."

And section 492 of the same title reads in part:

"The Secretary of Agriculture shall by regulation provide for the making of prompt investigations and the issuing of certificates as to the quality and condition of produce received in interstate commerce * * * upon application of any person, firm, association, or corporation shipping, receiving, or financially interested in, such produce. * * * A certificate made in compliance with such regulations shall be prima facie evidence in all Federal courts of the truth of the statements therein contained as to the quality and condition of the produce; but if any such certificate is put in evidence by any party, * * * the opposite party shall be permitted to cross-

examine any person signing such certificate * * * as to his qualifications and authority and as to the truth of the statements contained in such certificate."

Each separate case will now be considered.

## W. W. Elzea, Inc.

Five shipments of butter purchased by this defendant were involved in this case, and were inspected between July 10 and September 7, 1944. Plaintiff's proof showed that three of them were 90 score or B grade, and that defendant paid grade A price. Another, inspected on July 25, 1944, from Kolona Creamery, was graded as to five of the churnings 89–C and the remaining five churnings 90–B, and for all of this butter defendant paid grade A prices. Another shipment, from Farmers Cooperative Creamery, of Rock Rapids, Iowa, inspected August 16, 1944, because of the finding of mold in two of the churnings, was graded "no grade," but the flavor was graded as B and defendant paid for this butter grade A price for 10,647 pounds and B price for the balance 4,536 pounds. It was also shown, with reference to the churnings containing mold, that it was on the parchment lining and not on the butter, and that defendant requested the official grader not to grade it until an opportunity had been given to remove the mold. The grader admitted that after the mold was removed the butter might have been perfectly good; the fact that mold was found was no indication of the grade of the butter. However, he was not requested to grade it after the mold was removed, and testified, as above, that this lot was grade B because it had a definitely old cream flavor.

Upon the defendant's case, it was shown that this defendant had been in business for fifty years and annually received from 2¼ to 3 million pounds of butter, most of it from cooperative creameries, whose product ran fairly consistent week in and week out, and for which had been paid the same grade price before the current butter shortage. The butter was paid for within two to five days after its receipt. Although the invoices introduced in evidence are dated at or about the time payment was made, they were not actually received by the defendant from the shippers of the butter until about two months after the butter was graded. Defendant's secretary, who had charge of the butter department, graded all of the butter received by the company, along with his butter salesmen, who graded some of it. No records were kept of the flavor or other rating of the butter, except on the remittance return prepared and sent by defendant to the creamery with the check in payment. That return contains the price of the butter depending upon its grade, and in each instance it corresponded with the invoice later received from the creamery, in which invoice the grade was also mentioned. The salesman was not called, and the witness testified that he was acquainted in a general way with the Department of Agriculture specifications for grading, but very rarely followed the scorings indicated in its specifications except in a general way. He did not go into such fine distinctions enumerated in the Department regulations, but kept a record of the grades on the remittance statement.

## Irving Fuchs.

This case involved four purchases of butter, inspected between July 10 and August 3, 1944, one of them graded by the plaintiff's grader 92–A, for which the defendant paid AA price; and the other three 90–B, for which defendant paid A price.

Defendant graded all of the butter in question. He testified that he graded the July 10th shipment AA. The invoice from the creamery carried the same grade, and he paid on that basis. I do not recall that he testified as to the grade which he placed on any other shipment, but the stipulation would seem to cover that. He did not keep any notes of his gradings. He used most of the standards of the Department of Agriculture, but was obviously unable to state how he would grade under a certain given state of facts presented to him on cross-examination.

## Weinberg Butter & Egg Co., Inc.

This case involved three shipments of butter, one of which was inspected July 18, 1944, then graded 90–B, for which the defendant paid AA price; the second of which was inspected on July 20, 1944, then graded 90–B, for which the defendant paid an A price; and the third of which was inspected on August 4, 1944, then graded 90–B, for which the defendant paid an A price.

Defendant's secretary and treasurer was the only witness called in its behalf. He testified that the defendant had been in the

butter business since 1926, and handled about six million pounds of butter a year prior to Pearl Harbor, and about one-half of that since. He did the grading for the defendant along with the president of the company. The company had been dealing with the three creameries mentioned in the certificates for a period ranging from five to sixteen years, and during all of that time the butter received had been graded A or better, and when the butter came in he expected it to be of such grade. The creameries never sent any invoices with the grade of butter on it either before or since the price regulations. He graded the butter involved in this case, and after grading it, fixed the price that was paid. He says that he graded butter to the best of his ability pursuant to the United States standards, usually on the day of receipt. One other shipment of butter was examined by the Department grader besides those mentioned. He stated that his firm had kept proper books and issued invoices according to the regulations as best they knew. He made no notes of his gradings, and he had never asked for invoices from the creameries until November 1944.

### Llewellyn Watts and
### Llewellyn Watts, Jr.

Seven shipments of butter purchased by these defendants were involved in this case, between July 7 and August 28, 1944. All of them were graded by plaintiff's grader 90–B, with the exception of two churnings in one of the shipments inspected on August 8, 1944, which were graded 92–A. Defendants paid A and AA prices for all of this butter.

One of the defendants testified that in normal times the firm handles between 12 and 15 million pounds of butter, reduced recently to six million a year, running around five to six thousand pounds a week, and as low as a little over one thousand pounds the week preceding the hearing. The butter comes from Michigan, Iowa and Minnesota, and they have been dealing for five or six years with the creameries mentioned in the certificates. The butter in question was graded by the witness as he interpreted the Government grades. He stated that his firm had records covering the period prior to the investigation of butter received from the several creameries, which would indicate the prices paid to them, but that he was not asked for those records at the time of the investigation,

only for the records applying to the particular shipments graded. Before the regulations went into effect, none of the creameries sent invoices when they shipped the butter, but after the regulations became effective, the Calhoun Creamery, which was the creamery whose butter was graded in the last inspection, sent invoices and that invoice was shown to the OPA investigator when the inspection was made. Before the regulation, the firm sent the creameries an account of the sale, giving the price, and continued to do so afterwards. The amount of sales with the statements and the dates and checks sent in payment of the bills were produced and offered in evidence, from which it appeared that in every instance but one the butter was paid for before or on the same day that the butter was inspected. Up to the time of the investigation, defendants had been paying for butter on a 93 score grade, that is, they paid a premium over what they loosely termed as extras which, generally speaking, was a price basis for a deal with the creamery; extras are not generally the measure of quality, it loosely meant 92 score butter, but was used as a basis of trade, and extra quotation. Such a price basis did not prevail at the time of the trial. He kept no records of his grades, except his returns sent to the creameries, and made no notation churn by churn as he graded each lot of butter. He testified that he had asked Mr. Champlin, who was in charge of the New York office of the Dairy and Poultry Division of the War Food Administration, for information as to what the butter was scoring that was being investigated, and also for copies of the grading certificates, without success. He did not ask him to send a grader so that the defendant could get a grading certificate, although he knew that he could get one for the asking. Defendants, so the witness said, have put their creameries on notice that they were going to be particularly tough on the grading, and some have said that they could not afford to sell at a lower price, and defendants replied they could not help it, they would have to take it or leave it, it was too dangerous.

### J. R. Kramer, Inc.

Twenty-two inspections were involved in this case, twelve of which were graded by the Government grader at 90–B, for which the defendant paid at A or AA prices, two

of which were graded 90–B and 89–C, for which the defendant paid A and AA prices, three of which were graded 90–B and 92–A, for which the defendant paid A and AA prices, and five of which were graded 89–C, for which the defendant paid A price.

The defendant's general manager of the butter receiving department testified that he graded the butter in question, and after he had determined the grading in his own mind, he made notes as to what the grading actually was, handed them to the girl in the office, and she prepared the invoices on those grades; at times he gave her the prices to be charged. Neither before nor since the regulations went into effect did defendant receive invoices from any creamery or any memorandum of the grade. It has been the practice at all times for the defendants to send a memorandum of payment for every purchase. The evidence showed that advance payments of drafts were made in eleven instances, and in every case but one the full amount of the purchase price was paid on the day of or prior to the inspection by plaintiff's grader. The butter was graded to the best of the witness' ability, according to his knowledge of Government standards. He requested plaintiff's grader for a duplicate certificate, but it was refused, and he also asked him to grade for the defendants, but was told that that could not be done. He did not request grading by any other department grader, although he knew he could have had one had he applied for it. He has no records showing the results of his grading, except his bills, his notes having been thrown away after invoices were made up. Although the Army has purchased butter from defendants at lower grades than offered, no request for rebates have been made of the creameries, and the butter was sold at the defendant's grade.

### William Menzer, Inc.

Nine shipments of butter purchased by this defendant were involved in this case. The inspections were made between June 29, 1944 and August 25, 1944, and the grades of the butter were established by plaintiff's grader in seven of the examinations at 90–B, which butter, with one exception, was paid for by the defendant at A or AA prices. The one exception was with reference to the butter received from the Farmers Cooperative Creamery of Edgewood, Iowa, and inspected on August 25, 1944, which butter was sold by the defendants at B and A prices. Another shipment from Flandreau Cooperative Creamery was graded 90–B as to five churnings, and 89–C as to the sixth. All of this butter was paid for by the defendant at A price. The ninth shipment was inspected on August 16, 1944, and was purchased by the defendant from the Jerloe Commission Company. It consisted of print butter and was graded as a C grade, definitely stale. This butter was paid for by the defendant at AA prices.

Defendant's president testified that it has been in business for forty-two years, during which time it purchased and sold from six to seven million pounds of butter per year, recently about three million. He did the grading of the butter involved in this case and the grades established by him for each shipment were as set forth in the stipulation. When he inspects butter, and thinks what it is, he tells his bookkeeper to make the prices to be returned to the creamery. The records show that the butter was paid for in every instance either before or on the day when the plaintiff's grader made his inspection. When grading butter, the witness' practice was to inspect every churning in the shipment, and put down on a piece of paper whether the butter was good or bad. He did not place on that piece of paper the score or the grade. None of these pieces of paper, however, was produced, although other slips prepared by the bookkeeper relating to payments were.

### Zenith-Godley Co., Inc.

Twenty-four shipments purchased by defendant were involved in this case. Nine of the shipments were graded by plaintiff's grader 90–B, and the stipulation showed that the defendant paid for these shipments at A or AA prices. Three of the shipments were graded 90–B and 92–A, and the stipulation showed that two of these shipments were paid for on the basis of an A price, and the other one at an AA price. Twelve of the shipments were graded 92–A, and all of these were paid for by the defendant at AA prices.

Defendant proved that butter grading is an art and not an exact science, a matter of opinion more or less which after training and experience becomes an art. Two trained, experienced and honest men might have a difference of opinion. Four of the shipments graded by plaintiff's witness

were also graded by an Army inspector, who stated that the Army had its own specifications which were used by him in grading the butter which varied very little from those of the Department of Agriculture. These shipments were represented by certificates 94,499, 93,937 and 93,949, each of which shows a grade of 90–B; and the fourth by certificate 93,910, five churnings of which were graded 90–B because of a distinctly old cream flavor and the remaining seven 92–A.

Defendant's president testified that it had been in business for ninety-nine years, and that he specialized in operating the butter department, which included the inspection, purchasing and grading of butter. Defendant's average sales prior to 1943 were about twenty million pounds a year. Prior to price control this defendant paid premiums on better grades of butter, but since price control, the premiums have been discontinued. The product from the creameries with which defendant deals have varied very slightly over the years past. In the grading of butter, defendant has made every effort to abide by the standards of the Department of Agriculture. When butter is graded, a record is kept in a book, which was produced upon the trial, and which contained the grades given to the butter involved in this action as made by the witness.

He further testified that the butter shown in certificate 94,499 was some of the butter graded A by the Army grader; that he also graded it 320 boxes A and 22 boxes B. The Army did not get the 22 boxes. The butter mentioned in certificate 93,910 was also graded A by the Army grader, and the witness graded that butter A. This also appeared on the invoices. The butter shown on certificate 93,937 was also graded by the Army grader and by the witness as A, which was also the grade shown on the invoice. The butter shown on certificate 93,943 was also graded by the Army grader A, and the invoice specified it as A butter. He also testified that he gave to the butter the grades which are specified in the stipulation.

Prior to the price regulation, it was not customary for creameries to send invoices, but after the regulations became effective, the defendant had invoices prepared and printed and sent those to every one of the creameries with which it dealt. Some of the creameries did not comply with the defendant's request for graded invoices, but most of them did after several requests. He also testified that the alleged upgrading of butter would have no effect whatsoever on sales of quarter pound prints of the three top grades, and no effect whatsoever on the two top grades in one pound sales. Since the institution of this action, four of the creameries have stopped shipping butter to the defendant, reducing defendant's receipts by about 20%, but no reasons have been given for such stoppage.

The book kept by the defendant did not contain the particular flavor assigned to the butter, nor any reasons for the grade assigned to any lot, and the witness could not recall any such reason. The defendant deals with its creameries annually to purchase the output at a price dependent upon the grade of the butter produced by the creamery, which is initially determined between them by reference to prior ability of the creamery to produce that grade of butter, and the defendant agrees to pay a fixed price for such grade. The ceiling price of such butter depends almost wholly upon the flavor quality of the butter. As shipments are received, samplings are made to determine whether the butter is of the grade contracted for, and the defendant is influenced in its grading by the agreement made. Prior to the institution of this action, defendant had difficulty keeping its creameries and it assumed when a creamery left it, that it was finding a market for its butter somewhere else for more money. Defendant has lost about twenty-five of its fifty creameries because they were not satisfied with the grade defendant was putting on the butter and the price paid.

### John Doscher & Co.

Six shipments purchased by this defendant were involved. These shipments were inspected by the plaintiff's grader between June 28, 1944 and August 2, 1944, three of the shipments were graded 90–B, for two of which the defendant paid AA prices, and for the third of which it paid A and B prices; and the other three shipments were graded 92–A, for which the defendant paid AA prices.

Defendant testified that he graded the butter in question and paid for it at the prices at which he graded it. The creamery did not bill him as to grade, but it was his understanding that they were to ship A grade butter. However, he made no record of the flavors which he found, nor

of any defects. He wrote only the grade and the score, and was testifying entirely from his memory. He had no records which he had made at the time. He said that it was his practice to do everything he possibly could to satisfy his creamery.

### Charles E. Krasnoff

Four shipments were involved in this case, all of which were inspected between July 21, 1944 and August 28, 1944, and all of which were graded 90–B by the plaintiff's grader and for all of which the defendant paid A price.

The defendant testified that he had been in the butter business for twenty years, and at times he graded his own butter. He had sold some of the butter graded by Mr. Tuttle to the Army as grade A butter, but did not make any records of the grading of the butter and relied upon his memory to contradict the criticism made by the plaintiff's grader as stated in the certificates. When he was interviewed by the OPA investigator, he at first told the investigator that the Army had scored the butter, which he had purchased, at B grade, but that he would have to pay an A grade to the creamery. He subsequently corrected his statement, and said that the Army had found the butter to be A, after the investigator had told him a report would be made that he had to pay the creamery for one grade higher than the Army returned to him. He also told another investigator that this butter purchased by him during July and August 1944 was paid for by him at A or AA prices; that he sold the butter, which was not set aside for the Army, at A or AA prices, and that he sold the "set aside" butter to the Army at A or B prices.

### Charles Wheeler & Co.

Eight shipments were purchased by the defendants in this particular case, and were inspected by the plaintiff's grader between July 10 and September 7, 1944. Five of the shipments were graded B, for which the defendants paid A and AA prices. One of the other shipments from the Verdigre Creamery had three churnings which were graded 89–C and five churnings graded 90–B, for which the defendant paid B and A prices. Three churnings in another shipment from the Kegley Creamery were graded 90–B and one churning 89–C, for which the defendant paid A price. The eighth shipment consisted of print butter

from the Kegley Creamery, was graded 89–C, and the defendant paid B price for it.

The defendant Charles Wheeler testified that he had been in the butter industry for over twenty years, during part of which time he was employed by the United States as an Assistant Senior Marketing Specialist, during which his duties consisted of grading butter and supervising the processing of cheese for the Department of Agriculture. He testified that he graded the butter in question and that the grade was represented by the prices paid. He has no records of any of the grading which he made, or which is involved, and his recollection of the grades which he gave the butter in question are solely from his memory. He had made an affidavit in opposition to the motion for an injunction in this case, in which he stated, "The butter is usually graded by the creamery before it reaches its destination in New York and the butter is purchased as is at the time it leaves the creamery." He said upon the trial that as so worded, it would not be true.

■ A complete statement of the evidence upon the first question has not been attempted. Enough has been said to demonstrate that what was the proper grade of this butter is a question of fact. For the plaintiff, the grading certificates are prima facie evidence of their truth. The party who made them has been subjected to lengthy and varied cross-examination by nearly every defendant. He was an experienced and disinterested butter grader, officially employed by the United States Department of Agriculture for that very purpose, clearly competent by long years of practice and experience to decide and certify what the grade of the butter was according to the standards prescribed by the Department of Agriculture. Certainly, some standard of butter grades must be maintained, which cannot be left to the varying determination of persons who may be influenced by their desire to purchase as much as their requirements necessitate, and to sell as best they can profitably. Butter is, and for some time has been scarce, at least so far as the private consumer market is concerned. Half, and perhaps more of the butter produced, has been set aside for governmental purposes. The consequent scarcity to the retail consumer has produced inevitably a seller's market,

in which creameries can sell wherever they choose and where they can get the highest price. Wholesalers are vieing with each other to purchase, with a like urge, and the final consumer eats oleomargarine when he can get it, butter if he has the points and it is available, and goes without one or the other the rest of the time. What effect that has been upon selling prices can well be imagined in a country where a denial or prohibition of anything immediately inspires a burning determination to acquire. All of the defendants, with but one exception, have founded their defense upon interested testimony, without attempting in any way to corroborate the same by the testimony of the creamery as to the grade sold. That failure, it seems to me, is significant in view of the requirement in maximum price regulations that the butter must be graded by the seller. The contention of one set of defendants that there is no requirement that the butter be graded by the defendants emphasizes this requirement; even though the very defendants making the contention also saw fit to grade, and did not insist that its creameries comply with the regulation as to the furnishing of an invoice. In fact, none of the defendants did. The butter, in almost every instance, was paid for before invoices were received. It seems strange that no attempt was made to show by the manufacturer what kind of butter it sold and shipped. All defendants received copies of plaintiff's grading certificates upon the motions for injunction before the trial and were thus advised of the claims made. The statutory direction that the certificate of grade shall be prima facie evidence of its truth has not been overcome by the evidence of the defendants here. It must be and is determined that the butter in question was of the grade established by the official grader from the Department of Agriculture.

■ The question of good faith of the defendants, under the circumstances here shown, does not seem to be a controlling factor in the determination of the case. As I find the facts to be, the defendants did violate the regulations in purchasing butter at higher than ceiling prices. Section 925(b) of the Emergency Price Control Act, Section 205(b) of the Act of January 30, 1942, as amended, subjects persons who "wilfully" violate to criminal prosecution. Under subdivision (d) of that section, no person shall be held liable for damages or penalties for anything done or omitted to be done in good faith pursuant to any provision of a regulation. Under subdivision (e), provision is made for a recovery of treble damages, but not if the defendant proves that the violation of the regulation "was neither wilfull nor the result of failure to take practicable precautions against the occurrence of the violation." There is no qualification of wilfulness, good faith, or relating to failure to take precautions, in subdivision (a) of the section which authorizes injunctive relief. Undoubtedly, in view of the equitable nature of the relief sought, discretion as to the form of relief is vested in the court, but the standards of public interest measure the propriety and need for such relief. Hecht v. Bowles, 321 U.S. 321, 331, 64 S. Ct. 587, 88 L.Ed. 754. See also Bowles v. Franceschini, 1 Cir., 145 F.2d 510, 512.

■ The further point is made that there is no proof of irreparable damage to the plaintiff, and an injunction should, therefore, not follow. Proof of this character has been held not a prerequisite. Henderson v. Burd, 2 Cir., 133 F.2d 515–517, 146 A.L.R. 714.

■ And, finally, we have the question of whether or not plaintiff comes into this court with clean hands, in view of the fact that he refused to divulge to the defendants the score or grade of the butter when graded, by reason of which defendants were deprived of the right to appeal, and might not have made payment for the butter at the price at which they graded the butter, or which was demanded by the creameries manufacturing it. I cannot see how the doctrine relied upon has any application here. Plaintiff did nothing which in any way provoked or caused the violation. In nearly every instance, payment was made for the butter before it was graded by plaintiff and nothing that plaintiff did or omitted to do involved the defendants in their predicament. That defendants were deprived of any appeal from the grading made by plaintiff's grader did not prevent them from having the butter graded by another official grader of the Department of Agriculture immediately thereafter, and of appealing from that finding if adverse. None of the defendants made application for the grading conducted at the time. As a strict matter of law, I doubt if they had any right to a copy of

the certificate or to know what the grader found. The applicant for the grading was the OPA and as such, concededly, entitled to the certificate issued. It was not required to furnish that certificate or the results of the grading to the defendants. Its refusal so to do was not inequitable. Defendants were bound to know if their butter was of the grade for which they paid. Their complaint that they were not told that it was not is hardly an answer.

The injunction prayed for, however, is too broad. In view of the proof, an injunction will issue 'restraining and enjoining the defendants and each of them, and their agents and servants, from buying or accepting delivery of butter (1) at prices in excess of maximum prices established by maximum price regulation No. 289 as amended to date, and (2) unless defendants prepare and keep available proper invoices, books and records as required by such regulation; (3) from performing or omitting to perform any of said acts; and (4) from evading, either by direct or indirect methods, the price limitation set forth in said regulation as amended.

Proposed findings of fact and conclusions of law may be prepared by plaintiff within twenty days from this date, and a copy thereof shall be served upon the attorneys for each of the defendants. Defendants may have five days thereafter in which to make objections thereto, after which the findings and conclusions will be prepared by the court.