## UNITED STATES v. BIG BEAR MARKETS OF MICHIGAN, Inc.

### No. 11522.

United States District Court,
E. D. Michigan, S. D.

June 27, 1952.

Horace W. Gilmore, Asst. U. S. Atty., Detroit, Mich., for plaintiff.

Honigman, Miller, Schwartz & Poindexter, Detroit, Mich., for defendant.

KOSCINSKI, District Judge.

Plaintiff filed this civil action against the defendant to enjoin violations by it of Ceiling Price Regulation 25, Revised, issued pursuant to the Defense Production Act of 1950, as amended,. Public Law 69, 82nd Congress, 64 Stat. 798, Public Law 96, 82nd Congress, 50 U.S.C.A.Appendix, § 2061 et seq.

Defendant operates a chain of retail grocery and meat markets in the Detroit area. Violations of the Regulation by defendant are charged in the following respects: 1) Regular prediced stew-beef was offered for sale as Lean prediced stew-beef; 2) plate beef was offered for sale as short ribs; 3) grade marks were removed from beef; 4) beef of one grade was offered for sale as a higher grade at the price of the higher grade, and cuts of certain grade and other items were offered for sale at over-ceiling prices; 5) one cut of meat was offered for sale as another having a higher ceiling price; 6) meat displays were not prepared properly; 7) items of beef were improperly cut.

Plaintiff alleges that the violations in defendant's markets are repeated and continuous and that despite warning to discontinue these violative practices defendant still continues to violate provisions of the regulation.

Defendant admits that violations occurred in its markets but contends that they were not wilful, that errors in compliance

with regulations were minor in character, small in number, and insignificant in amount and are inevitably to be expected, in view of the large volume of defendant's business, despite its careful selection and supervision of employees, from complexity of the meat regulations as applied to a chain of supermarkets employing a large number of employees and handling thousands of retail sales daily.

A temporary restraining order was entered upon the filing of the complaint and plaintiff scheduled for hearing its motion for a preliminary injunction. In advance of the hearing and arguments on the motion, however, counsel for both parties agreed to have the matter heard on the merits inasmuch as substantially the same evidence would be presented at the trial as at the hearing on the motion. The temporary restraining order was thereupon continued by the court during progress of the case.

Plaintiff offered the testimony of the five Office of Price Stabilization inspectors whose reports of violations form the basis of this suit, as well as that of its meat analysts and others; defendant's president, director of meats, three supervisors, and the nineteen employees in charge of markets in which violations were found, testified on behalf of defendant.

For purposes of brevity further references herein to Ceiling Price Regulation and Office of Price Stabilization will be abbreviated as CPR and OPS, respectively.

From all the evidence presented at the trial, the court makes the following

### Findings of Fact.

1. CPR 25, which (1) defined and standardized cuts of beef items, (2) prescribed maximum prices in dollars and cents figures therefor, (3) required the placing of appropriate ceiling price on each display of beef cut, and (4) prohibited the sale at prices above maximum prices set forth therein, became effective on May 14, 1951.

2. CPR 25 was later amended, effective October 1, 1951. CPR 25, Revised, was in effect throughout the period of time covered by the complaint and is still in full force and effect.

3. Defendant corporation has been and is offering for sale in its chain of 24 self-serve and service markets beef items at retail subject to CPR 25, Revised.

4. Violations of this regulation were found in three of defendant's markets in January, 1952, and in nineteen markets in March, 1952. Suit was filed on March 28th, and six or seven markets were again found in violation after commencement of suit.

5. Plaintiff conceded at the trial that other OPS inspectional visits were made to defendant's markets when no violations were found. A record of these visits is unavailable since no report is made by OPS agents unless violations are found.

6. The most frequent instances of violation involved preparation of lean prediced stew-beef. CPR 25, Revised, defines regular and lean prediced stew-beef. The fat content of regular stew-beef may not exceed 25%; all trimmable fat must be removed in lean stew-beef. The regulation then defines trimmable fat as all fat except marbling. Stew-beef, labeled lean, was found in the stores with some trimmable fat not removed. One of the offending packages of stew-beef was offered in evidence. Some of the pieces had fat which could have been trimmed, although the fat content was small. Nevertheless, this package did not qualify under the regulation, as lean prediced stew-beef. Defendant sold large quantities of lean prediced stew-beef in its stores and it was frequently necessary to prepare it two or three times daily to meet the demand. Trimming of fat is a hand operation performed by the cutter with a knife. Sufficient care had not been exercised to remove all of the fat on some pieces of stew-beef.

7. Next in frequency were violations which concerned methods of cutting beef, particularly short-ribs, plate-beef, standing rib roasts, and chuck roasts.

CPR 25, Revised, defines short-ribs as the ends of ribs which are removed when making a 7-inch standing rib; beef, labeled by defendant as short-ribs, contained pieces of plate as a result of cutting beyond the area limited by the regulation. The same difficulty was encountered in preparation of plate beef which contained portions of ad-

joining neck cuts. Investigation by O.P.S. inspectors indicated that defendant's meat cutters were not complying with the method of cutting called for by the regulations.

Three stores were charged with offering for sale 10-inch as 7-inch standing ribs. Witnesses for both sides stated that the meat had a tendency to stretch after cutting and this and other testimony casts some doubt as to whether all three instances constituted actual violations.

The definition of chuck roasts in the regulation does not limit the size of this cut but under an OPS interpretation the pieces, for practical purposes, had to be sufficiently large to permit grade and cut identification. Beef meeting this requirement was cut into smaller pieces by defendant's employees to oblige requests of customers for smaller cuts, and unsold portions were returned to the chuck-roast platter and offered for sale as such, although pieces of that size were classified by OPS regulations as lean prediced stew-beef. Defendant received a notice from the local OPS office that this practice was followed in chain store markets in the Detroit area and should be discontinued. This is the only occasion on which defendant was warned in that manner. Immediately upon such notice Robinson, who was in complete charge of defendant's meat department, addressed letters to all supervisors, meat managers, and cutters, clarifying the OPS position on these cuts and demanded strict compliance therewith. The prohibited practice is now permitted by a change in the regulation.

8. Beef of choice grade was offered for sale by defendant as prime grade. The several beef grades are stamped on the carcass by government agents before delivery of the carcasses to the stores, for identification of the grade after cutting. Defendant handled only the two top grades, prime and choice. The ceiling price differential between prime and choice grades, on some of the cuts, is 10¢ a pound, but over half of the beef cuts are sold at the same ceiling price, whether prime or choice. One of the stores ran a "special" on all steaks at 99¢ a pound; ceiling prices on these steaks varied, being as high as $1.37 on some cuts. Three steaks with a ceiling price of only 92¢ were found on display at the 99¢ price. In some cases the violation consisted of improper display and failure to post grades and prices rather than upgrading; a few remaining pieces of one cut were sometimes placed in platters displaying a different cut, without identification of both cuts. Different cuts must be displayed in separate platters and properly identified. A majority of these violations consisted of mislabeling. In the self-serve stores such irregularities stemmed from lack of sufficient care in wrapping and labeling and failure to check packages before they left the wrapping room to be displayed in the counters.

9. Six charges of violation allege failure to post grade marks. This irregularity occurred usually in the service markets in which a price tag is placed on the top cut of meat displayed on a tray. When the tag was removed to sell the top cut employees neglected to replace the tag or failed to secure the label to prevent falling to the bottom of the counter or entirely neglected to post grades on some of the platters of meat.

10. Offers for sale of inferior as higher grade cuts were also primarily chargeable to the service markets. In one market equal portions of $1.21 and $1.17 beef were used for preparation of minute steaks at an average of the two prices, or $1.19 a pound, although the ceiling price on minute steaks was only $1.06 a pound. Improper display also contributed to charges of violation. Some cuts were improperly graded and priced. Store employees exercised their own judgment frequently without consulting the supervisor to determine whether prices and cuts were within purview of OPS regulations.

11. Over-ceiling charges were found in four stores; these were clear errors in pricing; two of the violations involved a difference of 1¢ per pound.

12. Two markets displayed beef roasts which bore no government grade marks. Cutters trimmed excess fat from the roast to within one inch, as required by one provision of the regulation, but removed the grade marks in the process of trimming to run afoul another provision which subjected

such ungraded meat to classification as utility or the lowest grade of beef.

13. Classification by the OPS inspector was disputed in most cases by managers and cutters although the meat was removed from the counters. The testimony at the trial indicated that in the majority of these cases the employees were in error as to their classification.

14. Some but not all inspections by OPS agents were reported to supervisors by managers and cutters. Most of the inspections were made by OPS agent Hruska, a former meat market manager employed by defendant, who was well acquainted with most of his co-employees. He was a frequent visitor and shopper at defendant's stores before the official inspection visits were made and still continues to shop at defendant's markets. None of the store employees were informed that charges of violation were lodged against them and the manner in which violations were called to their attention led them to accept Hruska's remarks by store employees and supervisors in the spirit of constructive criticism rather than as charges of violation. Consequently, notice of these visits never reached Robinson except in the one or two instances previously mentioned.

15. Defendant claims that overcharges involved in these violations totalled a difference of $20.82 in price, as compared to a retail price meat inventory in defendant's stores at that time amounting to $90,000.00, representing an exceptionally high average of compliance. This average does not take into account all violations. Hruska and other inspectors usually examined all of the meats in the self-serve counters but pointed out only such irregularities in the service markets as were visible to them through the glass counters, without examining the entire display. Hruska was unable to state, with any degree of specificity, the amount of meat involved in these stores. Furthermore, only such violations were considered as were reported on inspectional tours while other violations may have occurred.

16. Defendant was careful and selective in its choice of personnel in the meat department. Robinson, the director of meats, was well qualified for this post by reason of his long and varied experience in positions of responsibility in the meat industry, including that of Civilian Director of Meat Purchases for the Office of the Quartermaster General of the U. S. Army during the war. Supervisors, meat managers, and cutters possessed considerable experience in the meat business.

17. The court is impressed with the earnestness of both Shaye, defendant's president, and Robinson, who controlled activities of meat department employees, in their efforts to exact from such employees the strictest observance of OPS requirements. Correspondence from defendant's files containing demands for rigid compliance was introduced in evidence.

18. As soon as notice of CPR 25 reached him, Robinson made a study of its provisions, acquainted Shaye with its highlights, and conferred with his supervisory assistants to discuss introduction of procedure most likely to secure effective compliance in defendant's markets. Copies of the meat chart contained in the regulation, "blown-up" to adequate proportions, were posted in each cutting room; ceiling price lists were furnished to all stores; supervisors, meat managers, and available cutters were summoned to a meeting at which provisions of CPR 25 were discussed and illustrated by Robinson through a cutting demonstration; importance of 100% compliance with OPS regulations was stressed. To achieve uniformity, interpretation was entrusted to Robinson and his supervisory help. Copies of the CPR 25 pamphlet were therefore withheld from the stores to avoid as many interpretations as there were stores and store employees were instructed to consult with supervisors on OPS matters. In the belief that this plan was operating effectively, the same procedure was followed in October, 1951, when CPR 25, Revised, was issued.

19. Since the advent of OPS regulation a third supervisor was appointed to insure a more rigid supervision of the markets necessitated by the regulation.

20. In the period during which OPS regulations continued in effect, one meat manager and numerous wrappers were discharged for general inefficiency, including

carelessness in complying with OPS regulations.

21. At the trial plaintiff stressed defendant's failure to supply individual stores with copies of OPS promulgations; this lapse was not due to carelessness or indifference to regulatory provisions but was purposeful and designed to avoid misinterpretation and, if it contributed to occurrence of the violations, was at most an error in judgment.

22. Except for the letter from OPS to Robinson on the chuck-roast sales, as mentioned heretofore, and but for the one or two calls from store employees with reference to OPS inspections of their stores, shortly before trial, which were investigated by Robinson, neither he nor Shaye had any notice that violations occurred in the stores. They learned of the suit through pages of local newspapers and forthwith contacted the local OPS office, Shaye accepted service of process, and a special meeting of the employees involved was called for the following morning, March 29th, to learn the details of the violations.

23. Plaintiff contends that defendant has practically ignored the restraining order issued by the court, in view of testimony by all but one of defendant's employees that they had no knowledge of the issuance of a retraining order at the meeting on March 29. At that meeting employees were informed by Shaye that despite the fact it was a Saturday and their busiest day at the market, each of them would be required to hear the account of every employee charged with a violation so that each man could benefit by the experience of all the others; they were advised that Big Bear markets were in serious trouble with OPS, that an injunction was issued, and that each of them must so arrange affairs at his store that no further violations would be found, at the cost of their jobs. Shaye and Robinson who conducted the meeting, as well as all employees, were laymen, perhaps not too conversant with legal terminology. Although couched in simple every-day language, this announcement was, if anything, more portentous under the attending circumstances than a reference to a restraining order and its legal implications.

24. Despite measures taken by management and supervision to instruct employees on OPS regulations and exact compliance, testimony of witnesses for both parties disclosed an amazing lack of even nodding acquaintance with many of these regulations on the part of store employees during inspections by OPS agents. The agents were frequently asked, on such occasions, just how certain cuts were to be prepared to conform to the regulation and defendant's witnesses admitted in their testimony that the method demonstrated by the agent differed from the one they followed. This disclosure casts considerable doubt on the efficacy of some of the educational and enforcement measures originally adopted by the defendant.

25. Athough Robinson's anticipation of difficulty in interpretation by the average meat department employee in defendant's markets was somewhat justified when Robinson himself was unable to secure an immediate ruling from the local OPS office on the permissibility of a particular cut of meat, and waited ten days for an official interpretation, copies of OPS regulatory provisions should have been furnished to the stores, with instructions to study the provisions but to leave interpretation to their superiors. Furthermore, demonstration of proper cutting methods under the regulation, by persons charged with enforcement of the regulation rather than defendant's own staff, would furnish more assurance of correct interpretation. In addition, all of the meat cutters should have been given the benefit of the cutting demonstration since the duty is principally theirs to prepare cuts in conformity with the regulation. Demonstrations by OPS officials were offered and defendant should have availed itself of that opportunity.

26. Selection of the means by which training of employees in this respect could be accomplished is a matter on which minds may differ and, though defendant's management did not, perhaps, make the best choice, it was not lacking in diligence or aggressiveness in this respect.

27. Since the commencement of this action sincere attempts have been made by some of the managers to change store routine to avoid future infractions. One of them devised a plan for stapling grade and price labels to prevent violations through failure to post grades and prices; another manager checks every package which leaves the wrapping room instead of spot-checking; one in charge of the store at which Hruska shops requested an inspection of counters on almost every such occasion so that his store would always be in compliance. Most of them exhibited a desire to cooperate with OPS objectives and to prevent future violations.

28. Two of the store managers (testimony would indicate that one of these is no longer on defendant's list of employees) were contumacious in their attitude toward Hruska during inspections of their stores but this court has concluded that it was primarily attributable to their acquaintance with Hruska, as a former co-employee, rather than hostility toward OPS policies. Violations in their stores were of a similar nature and resulted in the same manner as those in all the other stores.

29. The violations charged against defendant resulted primarily from lack of familiarity with provisions of CPR 25, Revised, on the part of store employees and confusion in interpretation. Some occurred while the manager was off-duty, or was alone in the store while an assistant was off-duty, or was teaching trainees in his store; others were found during inspections made on a busy shopping day, such as Friday, when some errors were likely to result from pressure of customer demands; at least a small percentage of error must be anticipated in the course of dependence on the performance of some 200 meat department employees in the type of business which defendant operates. OPS agent Hruska admitted that pricing and other errors were found in his store when he was in charge as manager.

30. None of the violations were flagrant, wilful, deliberate, or evasive attempts to circumvent provisions of the regulation, nor were they the result of hostility toward or disregard for OPS objectives.

31. By the time of the trial most of the employees charged with violations were able to repeat, by rote, pertinent provisions of the regulations or satisfactory interpretation thereof. Their testimony revealed an adequate indoctrination in OPS regulatory provisions to warrant an expectation of future compliance. This fact, coupled with the co-operative attitude of both management and employees, strengthens the conviction that further violations need not be apprehended.

32. This court does not condone nor minimize defendant's violations nor does it deem its record of past performance as a satisfactory record of OPS compliance. Not all of the instances, nor even a majority of them were insignificant errors likely to occur in every business. Excusing such deviations from regulation by stores subject to its terms would render nugatory the legislation under which regulations were issued and the objectives which led to enactment could not be attained. But for the factors mentioned in these findings, issuance of a permanent injunction would be warranted.

### Conclusions of Law.

1. The statutory authority of the OPS to apply for injunctive relief is found in Sections 409(a), 50 U.S.C.A.Appendix, § 2109(a), and 706(a) (b), 50 U.S.C.A.Appendix, § 2156(a) (b) of the Defense Production Act of 1950, as amended.

2. Language in those provisions is identical, in import, to that employed in a corresponding section of the Emergency Price Control Act of 1942, 50 U.S.C.A.Appendix, § 901 et seq., under which the grant of an injunction has been interpreted by the Supreme Court of the United States, in Hecht Co. v. Bowles, 321 U.S. 321, 64 S. Ct. 587, 88 L.Ed. 754 as not mandatory but within the discretion of the court. That case is a leading authority on permanent injunctions of this type and is particularly applicable to factual situations such as the one in the present suit. Except as noted, conclusions of law are drawn from that citation, as well as the District Court opinion in that case, appearing in Brown v. Hecht Co., 49 F.Supp. 528.

3. The Act under which this suit was filed does not require plaintiff to demonstrate that the conduct of defendant was wilful, or of a similar nature, to invoke injunctive processes. This requirement is, however, contained in sections dealing with criminal penalties and treble damage actions and its omission in the companion sections covering relief by injunction clearly shows that Congress intended to impose injunctive sanctions on non-wilful violators. Lack of wilfulness or good faith, therefore, does not bar issuance of the injunction.

4. Nor does any of the other factors found by the court in its findings of fact as mitigating in favor of defendant, in and of itself, furnish sufficient reason for denial of an injunction. Each of them may be considered by the court, however, together with all the others, in applying its discretion as to whether or not an injunction should be allowed under a given set of facts.

5. That discretion should be exercised in light of the large objectives of the statute; on the other hand, though standards of public interest not the requirements of private litigation measure the propriety and need for injunctive relief in such cases, an injunction may prove a harsh remedy against a defendant, subjecting him, as it may, to charges of contempt for any error in compliance, though due to fallibility of human performance and though compliance was otherwise exemplary.

6. It is elementary that the purpose of an injunction is to deter and not to punish. An injunction in proceedings of this nature should not issue unless thereby better compliance with law may be enforced and such consideration is addressed to the sound discretion of the court.

7. Plaintiff has made a showing that defendant has engaged in acts and practices violative of the Defense Production Act of 1950, as amended, and regulations thereunder.

8. The Act specifies the remedial action which the court may take, including permanent or temporary injunction, restraining order, *or other order* (emphasis supplied).

9. After considerable deliberation and in full cognizance of the importance of this litigation, as well as consideration of each and every circumstance surrounding these violations, and application of the principles herein enunciated, the court has reached the conclusion that a permanent injunction should not be granted at this time. It has further concluded, however, for these same reasons, that the complaint should not be dismissed but that the case should be continued on the docket for a period of six months and that during this period of time plaintiff may again make application for an injunction to this court if violations recur. Further, to dispel any confusion, if such confusion still exists on the interpretation of regulations, the order of this court shall provide for mandatory requirements to be carried out by defendant as an added precaution to induce compliance of the regulations.

An order consistent with these findings of fact and conclusions of law, will be entered.