## THE HECHT COMPANY v. BOWLES, PRICE ADMINISTRATOR.

No. 316.   Argued February 3, 4, 1944.—Decided February 28, 1944.

*Mr. Charles A. Horsky,* with whom *Mr. Spencer Gordon* was on the brief, for petitioner.

*Mr. Chester T. Lane,* with whom *Solicitor General Fahy,* and *Messrs. Richard H. Field, Thomas I. Emerson,* and *David London* were on the brief, for respondent.

MR. JUSTICE DOUGLAS delivered the opinion of the Court.

Sec. 205 (a) of the Emergency Price Control Act of 1942 (56 Stat. 23, 50 U. S. C. App. Supp. II, §§ 901, 925) provides: "Whenever in the judgment of the Administrator any person has engaged or is about to engage in any

acts or practices which constitute or will constitute a violation of any provision of section 4 of this Act, he may make application to the appropriate court for an order enjoining such acts or practices, or for an order enforcing compliance with such provision, and upon a showing by the Administrator that such person has engaged or is about to engage in any such acts or practices a permanent or temporary injunction, restraining order, or other order shall be granted without bond." The question in this case is whether the Administrator, having established that a defendant has engaged in acts or practices violative of § 4 of the Act is entitled as of right to an injunction restraining the defendant from engaging in such acts or practices or whether the court has some discretion to grant or withhold such relief.

Sec. 4 (a) of the Act makes it unlawful for a person to sell or deliver any commodity in violation of specified orders or regulations of the Administrator. A regulation issued under § 2 of the Act and effective in May, 1942 (7 Fed. Reg. 3153) provided that no person should sell or deliver any commodity at a price higher than the authorized maximum price (§ 1499.1) as fixed or determined by the regulation.[1] Since maximum prices were fixed with

---

[1] Sec. 1499.2 provided in part: "Except as otherwise provided in this General Maximum Price Regulation, the seller's maximum price for any commodity or service shall be: (a) In those cases in which the seller dealt in the same or similar commodities or services during March 1942: The highest price charged by the seller during such month—(1) For the same commodity or service; or (2) If no charge was made for the same commodity or service, for the similar commodity or service, most nearly like it; or (b) In those cases in which the seller did not deal in the same or similar commodities or services during March 1942: The highest price charged during such month by the most closely competitive seller of the same class—(1) For the same commodity or service; or (2) If no charge was made for the same commodity or service, for the similar commodity or service most nearly like it. 'Highest Price Charged During March 1942'. For the

reference to earlier base periods, the regulation also provided for the preservation and examination of existing records.[2] And provision was likewise made for the keeping of current records reflecting sales made under the regulation [3] and for the filing of maximum prices with the Administrator.[4]

purposes of this General Maximum Price Regulation, the highest price charged by a seller 'during March 1942' shall be: (a) The highest price which the seller charged for a commodity delivered or service supplied by him during March 1942; or (b) If the seller made no such delivery or supplied no such service during March 1942 his highest offering price for delivery or supply during that month."

The seller's maximum price for a commodity which cannot be priced under § 1499.2 was to be determined by the seller pursuant to a formula prescribed in § 1499.3.

[2] Sec. 1499.11 entitled "Base-period records" provided in part: "Every person selling commodities or services for which, upon sale by that person, maximum prices are established by this General Maximum Price Regulation, shall: (a) Preserve for examination by the Office of Price Administration all his existing records relating to the prices which he charged for such of those commodities or services as he delivered or supplied during March 1942, and his offering prices for delivery or supply of such commodities or services during such month; and (b) Prepare, on or before July 1, 1942, on the basis of all available information and records, and thereafter keep for examination by any person during ordinary business hours, a statement showing: (1) The highest prices which he charged for such of those commodities or services as he delivered or supplied during March 1942 and his offering prices for delivery or supply of such commodities or services during such month, together with an appropriate description or identification of each such commodity or service; and (2) All his customary allowances, discounts, and other price differentials."

[3] Sec. 1499.12 entitled "Current records" provided: "Every person selling commodities or services for which, upon sale by that person, maximum prices are established by this General Maximum Price Regulation shall keep, and make available for examination by the Office of Price Administration, records of the same kind as he has customarily kept, relating to the prices which he charged for such of those commodities or services as he sold after the effective date of this Gen-

There is no substantial controversy over the facts. Petitioner operates a large department store in Washington, D. C. and did a business of about $20,000,000 in 1942. There are 107 departments in the store and each sells a separate line of merchandise. In the fall of 1942 the Administrator started an investigation to determine whether petitioner was complying with the Act and the regulation. The investigation was a "spot check," confined to seven departments. In each of the seven departments violations were disclosed. As a result this suit was brought. The complaint charged violations of the maximum price provisions of the regulation and violations of the regulations governing the keeping of records and reporting to the Administrator. The Administrator prayed for an injunction enjoining petitioner from selling, delivering or offering for sale or delivery any commodity in violation of the regulation and from failing to keep complete and accurate records as required by the regulation. In its answer petitioner pleaded among other things that any failure or neglect to comply with the regulation was involuntary and was corrected as soon as discovered.

Numerous violations both as respects prices and records were discovered. Thus in six of the seven departments investigated there had occurred between May and October,

eral Maximum Price Regulation; and, in addition, records showing, as precisely as possible, the basis upon which he determined maximum prices for those commodities or services."

[4] Sec. 1499.13 (b) provided: "On or before June 1, 1942, every person offering to sell cost-of-living commodities at retail shall file with the appropriate War Price and Rationing Board of the Office of Price Administration a statement showing his maximum price for each such commodity, together with an appropriate description or identification of it. Such statement shall be kept up to date by such person by filing on the first day of every succeeding month a statement of his maximum price for any cost-of-living commodity newly offered for sale during the previous month, together with an appropriate description or identification of the commodity."

1942 some 3,700 sales in excess of the maximum prices with overcharges of some $4,600. The statements filed with the Administrator were deficient, some 400 items of merchandise being omitted. And there were over 300 items with respect to which no records were kept showing how the maximum prices had been determined.

There is no doubt, however, of petitioner's good faith and diligence. The District Court found that the manager of the store had offered it as a laboratory in which the Administrator might experiment with any regulation which might be issued. Prior to the promulgation of the regulation the petitioner had created a new section known as the price control office. That office undertook to bring petitioner into compliance with the requirements of the regulation in advance of its effective date. The head of that office together with seven assistants devoted full time to that endeavor. But the store had about 2,000 employees and over one million two hundred thousand articles of merchandise. In the furniture departments alone there were over fifty-four thousand transactions in the first ten months of 1942. Difficulties were encountered in interpreting the regulation, in determining the exact nature of an article and whether it had been previously sold and at what price, etc. The absence of adequate records made it difficult to ascertain prices during the earlier base-period. Misunderstanding of the regulation, confusion on the part of employees not trained in such problems of interpretation and administration, the complexity of the problem, and the fallibility of humans all combined to produce numerous errors. But the District Court concluded that the "mistakes in pricing and listing were all made in good faith and without intent to violate the regulations."

The District Court also found that the mistakes brought to light "were at once corrected, and vigorous steps were taken by The Hecht Company to prevent recurrence of

these mistakes or further mistakes in the future." The company increased its price control office to twenty-eight employees. New methods of internal control were instituted early in November, 1942 with the view of avoiding future violations. That new system of control "greatly improved" the situation. Petitioner undertook to make repayment of all overcharges brought to light by the investigation in case of customers who could be identified. It proposed to contribute the remaining amount of such overcharges to some local charity. The District Court concluded that the issuance of an injunction would have "no effect by way of insuring better compliance in the future" and would be "unjust" to petitioner and not "in the public interest." It accordingly dismissed the complaint. 49 F. Supp. 528. On appeal the Court of Appeals for the District of Columbia reversed that judgment, one judge dissenting. 137 F. 2d 689. That court held that the findings of the District Court were supported by substantial evidence, except that it did not consider whether the evidence supported the findings that an injunction would not insure better compliance in the future and would be unjust to petitioner. In its view the latter findings were immaterial. For it construed § 205 (a) of the Act to require the issuance of an injunction or other order as a matter of course, once violations were found.

The case is here on a petition for a writ of certiorari which we granted because of the importance of the problem in the administration of the Act.

Respondent insists that the mandatory character of § 205 (a) is clear from its language, history and purpose. He argues that "shall be granted" is not permissive, that since the same section provides that the Administrator "may" apply for an injunction and that, if so, the injunction "shall" be granted, "may" and "shall" are each used in the ordinary sense. It is pointed out that when the bill (for which the Act in its final form was substituted)

passed the House, § 205 (a) provided that "upon a proper showing" an injunction or other order "shall be granted without bond."[5]   The words "upon a proper showing" were stricken in the Senate and were replaced by the words "upon a showing by the Administrator that such person has engaged or is about to engage in any such acts or practices."   And the Senate Report in its analysis of § 205 (a) stated that "upon a showing by the Administrator that such person has engaged or is about to engage in any such acts or practices, a temporary or permanent injunction, restraining order or other order is to be granted without bond."   S. Rep. No. 931, 77th Cong., 2d Sess., p. 25.   Further support for the view that the issuance of an injunction is mandatory once violations are shown is sought in the pattern of federal legislation which provides relief by injunction in aid of law enforcement.   Some of those statutes[6] contain provisions quite close to the language of § 205 (a).   Others provide that an injunction or restraining order shall be granted "upon a proper showing"[7] or that federal district courts shall have jurisdiction to restrain violations "for cause shown."[8]   The argument is that when Congress desired to give the district courts discretion to grant or withhold relief by injunction it chose apt words to make its desire plain.

We agree that the cessation of violations, whether before or after the institution of a suit by the Administrator, is no bar to the issuance of an injunction under § 205 (a).

---

[5] H. R. 5479, 77th Cong., 1st Sess.

[6] "Upon a showing that such person has engaged or is about to engage in any such act or practice, a permanent or temporary injunction or decree or restraining order shall be granted without bond." Investment Company Act of 1940, 54 Stat. 842, 15 U. S. C. § 80a–41; Investment Advisers Act of 1940, 54 Stat. 853, 15 U. S. C. § 80b–9.

[7] Securities Act of 1933, 48 Stat. 86, 15 U. S. C. § 77t (b); Securities Exchange Act of 1934, 48 Stat. 899, 15 U. S. C. § 78u (e).

[8] Fair Labor Standards Act, 52 Stat. 1069, 29 U. S. C. § 217.

But we do not think that under all circumstances the court must issue the injunction or other order which the Administrator seeks.

It seems apparent on the face of § 205 (a) that there is some room for the exercise of discretion on the part of the court. For the requirement is that a "permanent or temporary injunction, restraining order, or other order" be granted. Though the Administrator asks for an injunction, some "other order" might be more appropriate, or at least so appear to the court. Thus in the present case one judge in the Court of Appeals felt that the District Court should not have dismissed the complaint but should have entered an order retaining the case on the docket with the right of the Administrator, on notice, to renew his application for injunctive relief if violations recurred. It is indeed not difficult to imagine that in some situations that might be the fairest course to follow and one which would be as practically effective as the issuance of an injunction. Such an order, moreover, would seem to be a type of "other order" which a faithful reading of § 205 (a) would permit a court to issue in a compliance proceeding. However that may be, it would seem clear that the court might deem some "other order" more appropriate for the evil at hand than the one which was sought. We cannot say that it lacks the power to make that choice. Thus it seems that § 205 (a) falls short of making mandatory the issuance of an injunction merely because the Administrator asks it.

There is, moreover, support in the legislative history of § 205 (a) for the view that "shall be granted" is less mandatory than a literal reading might suggest. We have already referred to a portion of the Senate Report which lends some support to the position of the Administrator. But in another portion of that Report there is the following reference to suits to enjoin violations of the Act: "In common with substantially all regulatory statutes, the

bill authorizes the official charged with the duty of administering the act to apply to any appropriate court, State or Federal, for an order enjoining any person who has engaged or is about to engage in any acts or practices which constitute or will constitute a violation of any provision of the bill. Such courts are given jurisdiction to issue whatever order to enforce compliance is proper in the circumstances of each particular case." S. Rep. No. 931, *supra,* p. 10. A grant of *jurisdiction* to issue compliance orders hardly suggests an absolute duty to do so under any and all circumstances. We cannot but think that if Congress had intended to make such a drastic departure from the traditions of equity practice, an unequivocal statement of its purpose would have been made.

We do not stop to compare the provisions of § 205 (a) with the requirements of other federal statutes governing administrative agencies which, it is said, make it mandatory that those agencies take action when certain facts are shown to exist.[9] We are dealing here with the requirements of equity practice with a background of several hundred years of history. Only the other day we stated that "An appeal to the equity jurisdiction conferred on federal district courts is an appeal to the sound discretion which guides the determinations of courts of equity." *Meredith* v. *Winter Haven,* 320 U. S. 228, 235. The historic injunctive process was designed to deter, not to punish. The essence of equity jurisdiction has been the power of the Chancellor to do equity and to mould each decree to the necessities of the particular case. Flexibility rather than rigidity has distinguished it. The qualities of mercy and practicality have made equity the instrument for nice adjustment and reconciliation between the public interest and private needs as well as between competing private

---

[9] National Labor Relations Act, 49 Stat. 453, 29 U. S. C. § 160 (c); Clayton Act, 38 Stat. 734, 15 U. S. C. § 21; Federal Trade Commission Act, 38 Stat. 719, 15 U. S. C. § 45 (b).

claims. We do not believe that such a major departure from that long tradition as is here proposed should be lightly implied. We do not think the history or language of § 205 (a) compel it. It should be noted, moreover, that § 205 (a) governs the procedure in both federal and state courts. For § 205 (c) gives the state courts concurrent jurisdiction with federal district courts of civil enforcement proceedings. It is therefore even more compelling to conclude that, if Congress desired to make such an abrupt departure from traditional equity practice as is suggested, it would have made its desire plain. Hence we resolve the ambiguities of § 205 (a) in favor of that interpretation which affords a full opportunity for equity courts to treat enforcement proceedings under this emergency legislation in accordance with their traditional practices, as conditioned by the necessities of the public interest which Congress has sought to protect. *United States* v. *Morgan,* 307 U. S. 183, 194 and cases cited.

We do not mean to imply that courts should administer § 205 (a) grudgingly. We repeat what we stated in *United States* v. *Morgan, supra,* 191, respecting judicial review of administrative action: ". . . court and agency are not to be regarded as wholly independent and unrelated instrumentalities of justice, each acting in the performance of its prescribed statutory duty without regard to the appropriate function of the other in securing the plainly indicated objects of the statute. Court and agency are the means adopted to attain the prescribed end, and so far as their duties are defined by the words of the statute, those words should be construed so as to attain that end through coordinated action. Neither body should repeat in this day the mistake made by the courts of law when equity was struggling for recognition as an ameliorating system of justice; neither can rightly be regarded by the other as an alien intruder, to be tolerated if must be, but never to be encouraged or aided by the other in

the attainment of the common aim." The Administrator does not carry the sole burden of the war against inflation. The courts also have been entrusted with a share of that responsibility. And their discretion under § 205 (a) must be exercised in light of the large objectives of the Act. For the standards of the public interest, not the requirements of private litigation, measure the propriety and need for injunctive relief in these cases. That discretion should reflect an acute awareness of the Congressional admonition that "of all the consequences of war, except human slaughter, inflation is the most destructive" (S. Rep. No. 931, *supra,* p. 2) and that delay or indifference may be fatal. Whether the District Court abused its discretion in dismissing the complaint is a question which we do not reach. The judgment must be reversed and the cause remanded to the Court of Appeals for that determination.

*Reversed.*

MR. JUSTICE FRANKFURTER agrees that § 205 (a) of the Emergency Price Control Act, apart from dispensing with any requirement for a bond, does not change the historic conditions for the exercise by courts of equity of their power to issue injunctions, according to which the Court of Appeals should now dispose of this cause.

MR. JUSTICE ROBERTS is of opinion that the judgment of the Court of Appeals should be reversed and that of the District Court affirmed.