688 F.2d 204
 17 ERC 2155, 12 Envtl. L. Rep. 21,020
 UNITED STATES of America, Appellant,
v.
Charles PRICE, individually and d/b/a Price's Trucking
Company; Virginia Price; Carl F. Price; Bernard Abramoff,
Lee Garrell, Frank Abramoff, individually and d/b/a A. G. A.
Partnership; Astropak Corp.; Chemical Control Corp.; William
Carracino; Michael Colleton; Robert Day; Scientific Chemical
Processing, Inc.; Leif R. Sigmond; Dominick Presto;
Petroleum Tank Cleaning and Disposal, Inc.; Wayne D. Hamby;
Carol M. Hamby; Marvin Jonas, Inc.; Samuel H. Jones,
individually and d/b/a S-J Transportation Co.; Evor Phillips
Leasing Co.; Evor R. Phillips; King of Prussia Technical
Co.; Ernest R. Roth; Harrison L. Kalbach; Robert A.
Hauslohner; Harry T. Devine; George Strawbridge; Chemquid
Disposal Inc.; Harvey Brooks; Henry Engels; Daniel F.
Jackson; Union Carbide Corp.; Honeywell, Inc.; Princeton
Chemical Research, Inc.; Essex Chemical Corp.; Hoffman-la
Roche, Inc.; Krylon Corp.; Amaco Chemicals Corp.; Rollins
Environmental Services, Inc.; Triangle PWC, Inc.; and the
Proctor and Gamble Co.
Atlantic City Municipal Utilities Authority, Intervenor.
 No. 82-5030.
 United States Court of Appeals,
Third Circuit.
 Argued Aug. 2, 1982.
Decided Sept. 14, 1982.
As Amended Oct. 19, 1982.
 
 1
 Lloyd S. Guerci, Jacques B. Gelin, Wendy B. Jacobs, Peter R. Steenland, Jr., Dept. of Justice, Washington, D. C., W. Hunt Dumont, U. S. Atty. (argued), Ralph A. Jacobs, Michael V. Gilberti, Asst. U. S. Attys., Newark, N. J., for appellant.
 
 
 2
 John P. Hauch, Jr. (argued), Archer, Greiner & Read, Haddonfield, N. J., for appellees Bernard Abramoff, Lee Garrell, Frank Abramoff individually and d/b/a A. G. A. Partnership.
 
 
 3
 Robert E. Gladden (argued), Gladden, Brierley & Paglione, Camden, N. J., for appellees Charles Price, individually and d/b/a Price's Trucking Co., Virginia Price and Carl F. Price.
 
 
 4
 S. Joseph Fortunato, William H. Hyatt, Jr., Pitney, Hardin, Kipp & Szuch, Morristown, N. J., for amicus curiae Union Carbide Corp.
 
 
 5
 Before ALDISERT and WEIS, Circuit Judges, and RE,* Chief Judge.
 
 OPINION OF THE COURT
 
 6
 RE, Chief Judge of the Court of International Trade.
 
 
 7
 In this action, brought under section 7003 of the Resource Conservation and Recovery Act (RCRA), 42 U.S.C. § 6973, and section 1431 of the Safe Drinking Water Act (SDWA), 42 U.S.C. § 300i, plaintiff United States, on behalf of the Administrator of the Environmental Protection Agency (EPA), appeals from the denial of its application for a preliminary injunction. The requested injunction would have required defendants to (1) fund a diagnostic study of the threat to Atlantic City's public water supply posed by toxic substances emanating from Price's Landfill, a former commercial landfill, and (2) provide an alternate water supply to homeowners whose private wells have been contaminated by substances leaching from the landfill.
 
 
 8
 The question presented on this appeal, whether the district court abused its discretion in denying plaintiff's request for preliminary relief, is answered in the negative. Therefore, we affirm and direct the district court to proceed as expeditiously as possible with a trial on the merits of this action. In view of certain findings and conclusions of the district court, we deem it necessary to comment on the availability of equitable relief in actions brought under these provisions.
 
 Background
 
 9
 Section 7003 of RCRA provides that whenever the United States receives evidence that the handling, storage, treatment, transportation or disposal of hazardous waste may present an "imminent and substantial endangerment to health or the environment," it may bring suit immediately to restrain any person contributing to such activity or "to take such other action as may be necessary." Section 1431 of SDWA authorizes the Federal Government to commence "a civil action for appropriate relief, including a restraining order or permanent or temporary injunction" whenever it receives information that "a contaminant which is present in or is likely to enter a public water system may present an imminent and substantial endangerment to the health of persons."
 
 
 10
 Pursuant to the authority conferred by these provisions, the United States, on December 22, 1980, filed this action against the present owners and the former owners and operators of Price's Landfill. A hearing, which was held on plaintiff's application for preliminary relief, resulted in extensive and detailed findings of fact by the district court. See United States v. Price, et al., 523 F.Supp. 1055 (D.N.J.1981). These findings may be summarized as follows:
 
 
 11
 Price's Landfill is a twenty-two acre lot situated on the border of the City of Pleasantville and the Township of Egg Harbor in New Jersey. It was owned by Charles and Virginia Price from 1960 until 1979 when they sold it to the present owners, A. G. A. Partnership.
 
 
 12
 In 1970, on his initial application for a license to conduct a sanitary landfill operation, Charles Price listed the materials he intended to accept for disposal at Price's Landfill. He specifically excluded "Chemicals (Liquid or Solid)." In his proposed landfill design, submitted on September 29, 1971, he made no provision for the disposal of chemical wastes, despite the fact that earlier that year he had begun accepting chemical wastes for disposal at the landfill.
 
 
 13
 When Charles Price applied to renew his permit in February 1972, for the first time he sought permission to accept and dispose of chemical wastes. His permit was renewed, however, only on the condition that no soluble or liquid industrial wastes, petrochemicals, waste oils, sewage sludge or septic tank wastes be disposed at the site. Nevertheless, Price's Landfill continued to accept chemical and industrial wastes for disposal in direct contravention of the conditions of the license.
 
 
 14
 During 1971 and 1972, Price's Landfill accepted for disposal approximately 9 million gallons of assorted industrial and chemical wastes. These wastes were disposed of with minimal precautions. Frequently, they would be poured into the refuse from an open spigot on a tank truck; at other times, drums of chemicals would simply be buried under the refuse. The dumping of chemical wastes at Price's Landfill ended in November of 1972, and, in 1976, the operation of the site as a commercial landfill ceased.
 
 
 15
 Upon purchasing the property in 1979, A. G. A. Partnership acknowledged in writing that the site had been used as a landfill. Although two of the three members of the A. G. A. Partnership, including the member who negotiated the purchase, were licensed real estate brokers, no one inquired whether hazardous wastes had been deposited there. Neither did anyone from or on behalf of A. G. A. inspect the property or take steps to determine if the landfill had been properly closed.
 
 
 16
 As a result of the chemical dumping which occurred during 1971 and 1972, water samples drawn from the area in and around Price's Landfill during the years 1979-81 were found to contain numerous contaminants in quantities likely to create grave hazards to human health. Among the contaminants were: arsenic, a highly toxic metal and an established human carcinogen; lead, a toxic metal and a suspected human carcinogen and teratogen; benzene, a highly toxic petroleum derivative and a potent carcinogen and teratogen; vinyl chloride, a toxic halogenated hydrocarbon and a suspected carcinogen and mutagen; and 1, 2 dichloroethane, a toxic chlorinated hydrocarbon, and a suspected carcinogen and teratogen.
 
 
 17
 Geohydrological evidence presented to the district court revealed that contaminants leaching down through the groundwater and away from Price's Landfill are forming a plume or region of contamination emanating into the Cohansey Aquifer, a saturated geologic deposit supplying water to approximately 35 private wells, and to 10 of the Atlantic City Municipal Utility Authority's 12 operating public wells. Many of the private wells are already contaminated beyond use, and 4 of the municipal wells are in imminent danger of serious contamination. Atlantic City has no readily accessible alternative source of water should these wells become contaminated.
 
 
 18
 These facts led the district court to conclude that Atlantic City's public water supply is in imminent and substantial danger of serious contamination by substances leaching from Price's Landfill. The court found that an extensive geohydrological study of the area around the landfill was "essential in devising a strategy to contain and mitigate the pollution and to protect Atlantic City's water supply," and that it was "imperative that such a study be done immediately." In ruling on various motions for summary judgment, the district court expressed its belief that the defendants could ultimately be held liable for the cost of abating this toxic hazard.
 
 
 19
 Despite these findings, stating that the remedies requested by plaintiff were inappropriate forms of preliminary relief, the district court denied plaintiff's application for a preliminary injunction. The court indicated that the issue of who should bear the costs of studying the toxic hazard, and obtaining an alternate water supply, should not be resolved on an application for a preliminary injunction.
 
 Post-Hearing Action
 
 20
 Several months after the government made its initial application for a preliminary injunction, but only two days before the district court issued its decision, plaintiff filed a second amended complaint adding as defendants 35 corporations and individuals who allegedly generated or transported hazardous wastes which were deposited at Price's Landfill. The new complaint also added two claims under the Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA or "Superfund"), 42 U.S.C. § 9601 et seq. The district court did not consider the effect of this amended complaint on plaintiff's request for preliminary relief, nor are the newly added defendants parties to this appeal.
 
 
 21
 After the district court issued its decision, the A. G. A. defendants, on October 6, 1981, moved for an order amending the district court's findings of fact and conclusions of law. Before the district court ruled on this motion, plaintiff, on November 17, 1981, filed its notice of appeal of the order denying its application for a preliminary injunction. On December 18, 1981, over plaintiff's objection, the district court issued an order staying all proceedings pending the resolution of plaintiff's appeal.
 
 
 22
 During the pendency of this appeal, the state of New Jersey extended public water mains into the area where private wells have been contaminated. Additionally, the EPA authorized funding of an initial study of the toxic hazard emanating from Price's Landfill.
 
 
 23
 Plaintiff contends that the funding of a diagnostic study and the provision of an alternate water supply are permissible forms of preliminary equitable relief both at common law and under the endangerment provisions of RCRA and SDWA. Consequently, it maintains that, having found an imminent and substantial endangerment to a public water supply and to human health for which the defendants were probably liable, the district court should have granted the requested relief. Plaintiff submits that the district court rejected its application merely because the proposed injunction would have required payments and expenditures of money.
 
 
 24
 Defendants urge us to dismiss this appeal for two reasons. First, they state that plaintiff failed to file a timely notice of appeal. Second, they argue that the appeal is moot because the relief requested has been provided by parties other than defendants. Alternatively, defendants contend that the district court did not abuse its discretion in denying plaintiff's request for preliminary equitable relief.
 
 Timeliness and Mootness
 
 25
 The argument that plaintiff's notice of appeal was of "no effect" under Federal Rule of Appellate Procedure 4(a)(4) because it was filed while a motion to amend the findings of fact and conclusions of law was pending has been definitively rejected by this court in recent cases. Horne v. Adolph Coors Co., 684 F.2d 255, 257 (3d Cir. 1982), slip op. at 2-4; Griggs v. Provident Consumer Discount Co., 680 F.2d 927, 929 (3d Cir. 1982). Cf. Tose v. First Pennsylvania Bank, 648 F.2d 879, 882 n.2 (3d Cir.), cert. denied, 454 U.S. 893, 102 S.Ct. 390, 70 L.Ed.2d 208 (1981) (exercise of discretion under Fed.R.App.P. 2). As we explained in Horne, "though a premature notice of appeal is subject to dismissal, we have generally allowed the appellant to proceed unless the appellee can show prejudice resulting from the premature filing of the notice." 684 F.2d 257.
 
 
 26
 Defendants have demonstrated no prejudice resulting from the premature filing; therefore, following our precedents in Horne and Griggs, we deem this appeal to be properly noticed.
 
 
 27
 Defendants next argue that this appeal is moot because the EPA has provided funds for an initial study of the toxic hazard emanating from Price's Landfill, and the New Jersey Department of Environmental Protection has ordered the installation of public water mains in the area where private wells have been contaminated. This argument fails for the simple reason that the remedial steps taken by parties other than the defendants have not provided the full measure of preliminary relief sought by plaintiff.
 
 
 28
 The funds provided by the EPA are not sufficient to carry out a complete study of the hazard posed by contaminants leaching from Price's Landfill. Moreover, although public water mains have been installed in the contaminated area, not all of the individual homes have been connected to the water mains, nor can all of the families afford the necessary cost. In short, this is not a case where the terms of the proposed injunction "have been fully and irrevocably carried out." University of Texas v. Camenisch, 451 U.S. 390, 398, 101 S.Ct. 1830, 1835, 68 L.Ed.2d 175 (1981).
 
 Equitable Relief
 
 29
 It is not questioned that the decision to grant or deny a preliminary injunction is committed to the sound discretion of the district court. Stokes v. Williams, 226 F. 148, 156 (3d Cir. 1915). Its decision must be affirmed unless it has abused its discretion, committed an obvious error in applying the law, or made a serious mistake in considering the proof. A. O. Smith Corp. v. F. T. C., 530 F.2d 515, 525 (3d Cir. 1976). See also Kennecott Corp. v. Smith, 637 F.2d 181, 187 (3d Cir. 1980); Eli Lilly & Co. v. Premo Pharmaceutical Laboratories, Inc., 630 F.2d 120, 136 (3d Cir.), cert. denied, 449 U.S. 1014, 101 S.Ct. 573, 66 L.Ed.2d 473 (1980).
 
 
 30
 In this case it cannot be said that the district court abused its discretion by choosing to wait until after trial to determine whether to grant the requested relief. In view of the actions which have been taken subsequent to the hearing on the preliminary injunction, to order the defendants represented on this appeal to provide the interim relief requested by plaintiff might further complicate and delay this litigation. The better course is to proceed expeditiously with a trial on the merits in which the rights and liabilities of all of the parties to this litigation may be finally determined.
 
 
 31
 While we agree with the district court that in this case it was not required to grant the requested preliminary relief, its reasoning casts doubt upon the powers of federal courts to grant the requested preliminary equitable relief. In its conclusions of law, the district court expressed an unduly restrictive view of its remedial powers both under traditional equitable doctrines as well as under the endangerment provisions of RCRA and SDWA.
 
 
 32
 A court of equity has traditionally had the power to fashion any remedy deemed necessary and appropriate to do justice in the particular case. As stated in Hecht Co. v. Bowles, 321 U.S. 321, 329, 64 S.Ct. 587, 591, 88 L.Ed. 754 (1944):
 
 
 33
 The essence of equity jurisdiction has been the power of the Chancellor to do equity and to mould each decree to the necessities of the particular case. Flexibility rather than rigidity has distinguished it. The qualities of mercy and practicality have made equity the instrument for nice adjustment and reconciliation between the public interest and private needs ...
 
 
 34
 Equity, in addition to achieving an individualization of justice, is also, in the words of Professor Zechariah Chafee, "a set of effective and flexible remedies admirably adapted to the needs of a complex society." E. Re, Cases and Materials on Remedies xxii (1982).
 
 
 35
 By enacting the endangerment provisions of RCRA and SDWA, Congress sought to invoke the broad and flexible equity powers of the federal courts in instances where hazardous wastes threatened human health. S.Rep.No.96-172, 96th Cong., 1st Sess., at 5, reprinted in (1980) U.S.Code Cong. & Ad.News 5019, 5023. Indeed, these provisions have enhanced the courts' traditional equitable powers by authorizing the issuance of injunctions when there is but a risk of harm, a more lenient standard than the traditional requirement of threatened irreparable harm. H.R.Rep.No.96-191, 96th Cong., 1st Sess. at 45 (1979); H.R.Rep.No.93-1185, 93d Cong., 2nd Sess., reprinted in (1974) U.S.Code Cong. & Ad.News 6454, 6488.
 
 
 36
 Whether authorized by statute or traditional equitable powers, a request for preliminary equitable relief requires a court of equity to weigh several factors in the effort to determine whether the request should be granted. Hecht v. Bowles, supra. Among the factors which guide the exercise of the courts' equitable discretion are: "(1) the probability of irreparable injury to the moving party in the absence of relief; (2) the possibility of harm to the non-moving party if relief is granted; (3) the likelihood of success on the merits; and (4) the public interest." Goldhaber v. Foley, 519 F.Supp. 466, 473 (E.D.Pa.1981). See also A. O. Smith Corp. v. F. T. C., 530 F.2d 515 (3d Cir. 1976); Leubsdorf, "The Standard for Preliminary Injunctions," 91 Harv.L.Rev. 525 (1978). The process of balancing these factors should not be abandoned merely because the preliminary relief requested is uncommon, non-traditional or novel.
 
 
 37
 In the case before us, the district court explained that, because plaintiff's request for funds to conduct a diagnostic study would have required monetary payments, it was an inappropriate form of preliminary equitable relief. In the eyes of the district court, it was an attempt to transform a claim for damages into an equitable action by asking for an injunction that orders the payment of money. This perception was based on the district court's reading of Jaffee v. United States, 592 F.2d 712 (3d Cir. 1979). In Jaffee, the plaintiff alleged that, as a soldier in the United States Army, he and other soldiers had been ordered to stand in an open field where they were exposed to radiation without their knowledge or consent. Plaintiff further alleged that, as a result of this exposure, he had developed inoperable cancer. This court affirmed the district court's denial of plaintiff's request for a preliminary injunction requiring the government to pay medical expenses, stating that the relief requested was a traditional form of damages in tort, and not a proper subject for equitable relief. The court of appeals, however, reversed the district court's denial of plaintiff's request for a preliminary injunction requiring the government to warn members of plaintiff's class about possible medical risks. The court stated: "Although providing the warning will impose an expense on the Government, the creation of an expense does not necessarily remove a form of relief from the category of equitable remedies." 592 F.2d at 715.
 
 
 38
 We do not agree that Jaffee leads to the conclusion that, in this case, plaintiff's request for an injunction was actually a claim for damages. Damages are awarded as a form of substitutional redress. They are intended to compensate a party for an injury suffered or other loss. A request for funds for a diagnostic study of the public health threat posed by the continuing contamination and its abatement is not, in any sense, a traditional form of damages. The funding of a diagnostic study in the present case, though it would require monetary payments, would be preventive rather than compensatory. The study is intended to be the first step in the remedial process of abating an existing but growing toxic hazard which, if left unchecked, will result in even graver future injury, i.e., the contamination of Atlantic City's water supply.
 
 
 39
 The appropriateness of issuing a mandatory preliminary injunction in a case in which the status quo "is a condition not of rest, but of action" was recognized in Toledo, A. A. & N. M. Ry. Co. v. Pennsylvania Co., 54 F. 730, 741 (C.C., N.D.Ohio 1893). There the court stated:
 
 
 40
 The office of a preliminary injunction is to preserve the status quo until, upon final hearing, the court may grant full relief. Generally this can be accomplished by an injunction prohibitory in form, but it sometimes happens that the status quo is a condition not of rest, but of action, and the condition of rest is exactly what will inflict the irreparable injury upon complainant.... In such a case courts of equity issue mandatory writs before the case is heard on its merits.
 
 
 41
 See E. Re, Cases and Materials on Remedies 245 (1982). The facts of the present case show clearly that the status quo is a condition of action which, if allowed to continue or proceed unchecked and unrestrained, will inflict serious irreparable injury. Therefore, a mandatory preliminary injunction designed to prevent that injury would have been appropriate if the other criteria relevant to issuing preliminary injunctions were satisfied. A preliminary injunction designed to prevent an irreparable injury is conceptually distinct from a claim for damages.
 
 
 42
 The fact that an injunction may require the payment or expenditure of money does not necessarily foreclose the possibility of equitable relief. See Jaffee, supra; U. S. W. A. v. Fort Pitt Steel Casting, 598 F.2d 1273 (3d Cir. 1979). In Crawford v. University of North Carolina, 440 F.Supp. 1047 (M.D.N.C.1977), the district court issued a mandatory preliminary injunction ordering the university to procure and compensate an interpreter for the benefit of a deaf student. In granting the requested relief the court stated:
 
 
 43
 Mandatory injunctions should be used sparingly. Moreover, an injunction should not work so as to give a party the full relief which he seeks on the merits, especially when the order would require the payment of money. Notwithstanding, it would appear that in a case where a party requests a mandatory preliminary injunction, the test is still one of balancing the competing interests.
 
 
 44
 Id. at 1058 (citations omitted). In C. B. S., Inc. v. ASCAP, 320 F.Supp. 389, 392 (S.D.N.Y.1970), it was stated that:
 
 
 45
 Although courts are rarely called upon to issue mandatory injunctions calling for the payment of moneys pendente lite, they have done so when the equities and the circumstances of the case demonstrated the appropriateness of the remedy. United States v. Whiting Milk Co., 21 F.Supp. 321 (D.Mass.1937), aff'd sub nom. H. P. Hood & Sons, Inc. v. United States, 97 F.2d 677 (1st Cir. 1938), aff'd 307 U.S. 588, 59 S.Ct. 1019, 83 L.Ed. 1478 (1939).
 
 
 46
 Thus, even though funding a diagnostic study would require payments of money, it may still be an appropriate form of preliminary relief if the traditional balancing process tips decidedly in favor of plaintiff.
 
 
 47
 It is not unusual for a defendant in equity to expend money in order to obey or perform the act mandated by an injunction. Injunctions, which by their terms compel expenditures of money, may similarly be permissible forms of equitable relief. In all cases the question the court must decide is whether, considering all of the circumstances, it is appropriate to grant the specific relief requested.
 
 
 48
 An example is found in the case of Wheelock v. Noonan, 108 N.Y. 179, 15 N.E. 67 (1888). In Wheelock, plaintiff brought an action to compel defendant to remove from certain lots owned by plaintiff a quantity of rocks and boulders deposited there by defendant. In granting the requested relief the court explained:
 
 
 49
 It is now said that the remedy was at law; that the owner could have removed the stone and then recovered of the defendant for the expense incurred. But to what locality could the owner remove them? He could not put them in the street; the defendant presumably had no vacant lands of his own on which to throw the burden; and it would follow that the owner would be obliged to hire some vacant lot or place of deposit, become responsible for the rent, and advance the cost of men and machinery to effect the removal. If any adjudication can be found throwing such burden upon the owner, compelling him to do in advance for the trespasser what the latter is bound to do, I should very much doubt its authority. On the contrary the law is the other way.
 
 
 50
 Judicial precedents indicate that the preliminary relief requested by plaintiff in this action was not inappropriate. Furthermore, it seems clear that it falls within the range of remedies contemplated and specifically authorized by Congress when it enacted the endangerment provisions of RCRA and SDWA.
 
 Statutory Equitable Relief
 
 51
 Section 7003 of RCRA authorizes the federal government to bring suit "to immediately restrain" certain activities "or to take such action as may be necessary" when the handling, storage, treatment, transportation or disposal of hazardous waste "may present an imminent and substantial endangerment to health or the environment." (Italics added.) The expansive language of this provision was intended to confer "overriding authority to respond to situations involving a substantial endangerment to health or the environment." H.R. Committee Print No. 96-IFC 31, 96th Cong., 1st Sess. at 32 (1979) (the Eckhardt Report). As stated in the Eckhardt Report:
 
 
 52
 The section's broad authority to "take such other actions as may be necessary" includes both short- and long-term injunctive relief, ranging from the construction of dikes to the adoption of certain treatment technologies, upgrading of disposal facilities, and removal and incineration.
 
 
 53
 Imminence in this section applies to the nature of the threat rather than identification of the time when the endangerment initially arose. The section, therefore, may be used for events which took place at some time in the past but which continue to present a threat to the public health or the environment.
 
 
 54
 The unequivocal statutory language and this legislative history make it clear that Congress, by enacting section 7003, intended to confer upon the courts the authority to grant affirmative equitable relief to the extent necessary to eliminate any risks posed by toxic wastes. Under section 7003, a court could not order the cleanup of a waste disposal site which posed no threat to health or the environment. There is no doubt, however, that it authorizes the cleanup of a site, even a dormant one, if that action is necessary to abate a present threat to the public health or the environment. See S.Rep.No.96-848, 96th Cong., 2d Sess., at 11 (1980); H.R.Rep. 96-1016 (Part I), 96th Cong., 2nd Sess., at 21 reprinted in (1980) U.S.Code Cong. & Ad.News, 6119, 6124. It is also clear that if a threat to human health can be averted only by providing individuals with an alternate water supply, that remedy, in an appropriate case, may be granted under the authority of section 7003.
 
 
 55
 The district court correctly observed that section 1431 of SDWA may not be invoked to protect private water supplies. Nevertheless, in terms of the types of relief which may be employed to protect public water supplies, the authority conferred on the courts by section 1431 of SDWA is quite as broad as that conferred by RCRA. Section 1431 of SDWA authorizes the United States to protect public water supplies from contamination by "commencing a civil action for appropriate relief, including a restraining order or permanent or temporary injunction." The forms of relief which are "appropriate" must be determined on a case by case basis in order to achieve the remedial purposes contemplated by the act.
 
 In the words of the House Report:
 
 56
 Section 1431 reflects the Committee's determination to confer completely adequate authority to deal promptly and effectively with emergency situations which jeopardize the health of persons.
 
 
 57
 ... (T)he section authorizes the Administrator to issue such orders as may be necessary ... to protect the health of persons, as well as to commence civil actions for injunctive relief for the same purpose.
 
 
 58
 H.R.Rep.No.93-1185, 93d Cong., 2d Sess., reprinted in (1974) U.S.Code Cong. & Ad.News 6454, 6487.
 
 
 59
 Both the specific statutory language and the House Report's concomitant expression of legislative intent are broad enough to authorize the diagnostic study requested in this action. Indeed, the House Report explicitly mentions the authority to issue orders "to obtain relevant information about impending or actual emergencies, ... to treat or reduce hazardous situations once they have arisen, or to provide alternative safe water supply sources in the event any drinking water source which is relied upon becomes hazardous or unuseable." Id.
 
 
 60
 Congress, in the endangerment provisions of RCRA and SDWA sought to invoke nothing less than the full equity powers of the federal courts in the effort to protect public health, the environment, and public water supplies from the pernicious effects of toxic wastes. Courts should not undermine the will of Congress by either withholding relief or granting it grudgingly.
 
 
 61
 Although it was within the power of the district court to grant the requested preliminary relief, the procedural posture of this litigation militates against granting it on this appeal. It would bind only a few of more than 35 defendants, and to require these few to bear the entire cost of the requested relief might prove impractical and unfair.
 
 
 62
 The district court found that an imminent danger existed at the time of the hearing. Nevertheless, it may well be that the public interest counseled against the grant of the requested preliminary relief. Very large sums of money were required to pay for the diagnostic study, and there may have been some question about the original defendants' financial ability to fund it. In those circumstances, the most practical and effective solution may well have been to refuse the government's request for a preliminary injunction thereby necessitating the study be undertaken by EPA without delay. Prompt preventive action was the most important consideration. Reimbursement could thereafter be directed against those parties ultimately found to be liable.
 
 
 63
 Finally, we noted that the district court erred in staying all proceedings during the pendency of this appeal. Although the filing of a notice of appeal ordinarily divests the district court of jurisdiction, S. E. C. v. Investors Security Corp., 560 F.2d 561, 568 (3d Cir. 1977), in an appeal from an order granting or denying a preliminary injunction, a district court may nevertheless proceed to determine the action on the merits. Thomas v. Board of Education, Granville Central School Dist., 607 F.2d 1043, 1047 n.7 (2d Cir. 1979). See generally 9 Moore's Federal Practice § 203.11, at 3-54 (2d ed. 1982); C. Wright, A. Miller, E. Cooper and E. Gressman, Federal Practice and Procedure § 3921 (1977).
 
 
 64
 The judgment of the district court will be affirmed. The parties no doubt will proceed as expeditiously as possible with pre-trial matters so as to permit the district court to schedule a final trial on the merits without delay.
 
 
 
 *
 Honorable Edward D. Re, Chief Judge of the United States Court of International Trade, sitting by designation