United States Court of Appeals,

Fifth Circuit.

No. 96-21074.

Scott WENNER, Plaintiff-Appellant,

and

BDM Enterprises, Inc., also known as Heart's Discount Liquor,
Intervenor Plaintiff-Appellant,

v.

TEXAS LOTTERY COMMISSION, Anthony Sadberry, Richard Daly, Jan
Hart, Nora A. Linares, and Linda Cloud, Defendants-Appellees.

Sept. 30, 1997.

Appeals from the United States District Court for the Southern
District of Texas.

Before DUHÉ and BARKSDALE, Circuit Judges, and COBB,[1] District
Judge.

HOWELL COBB, District Judge:

This suit arose after the Plaintiff purchased a winning Texas
lottery ticket and the defendants refused to honor it. The
Plaintiff filed suit in the federal district court for the Southern
District of Texas asking the court to order performance. The
district court granted summary judgment for the defendant on
grounds that the purchase of the ticket was illegal under the
Violent Crime Control and Law Enforcement Act of 1994 and
therefore, the contract resulting from the purchase of the ticket
was unenforceable. For reasons stated below, we disagree with the
district court.

_____

[1]District Judge of the Eastern District of Texas, sitting by
designation.

## I. HISTORY AND BACKGROUND

Lotteries in various forms have been a part of the American life since colonial times. Among the beneficiaries of early colonial lotteries were such notable institutions as Harvard and Yale Universities. However, until the early 1980's, States have traditionally been suspicious of lotteries believing them to be potentially injurious to their citizens. Congress has long supported state efforts to closely regulate lotteries or ban them entirely. State attitudes toward lotteries began to change in part because of taxpayer resistance to the imposition of new taxes and state needs for new sources of revenue. A substantial majority of states have now enacted some form of state lottery. In 1992, Texas established a state lottery which is operated by the Texas Lottery Commission (TLC). This case arose when the TLC refused to honor a winning lottery ticket bought through the services of a private corporation by an out-of-state player.

Before 1994, the sale of lottery tickets in interstate commerce was controlled by: 1) 18 U.S.C. § 1084(a), which made it illegal for one engaged in the business of betting or wagering to knowingly use a wire facility for transmitting bets or wagers in interstate commerce; 2) 18 U.S.C. § 1301, which made it illegal to physically carry lottery tickets in interstate commerce; and 3) 18 U.S.C. § 1953, which made it illegal to transport wagering paraphernalia in interstate commerce. These code sections created a web which, under most circumstances, adequately protected state lottery monopolies. However, Pic-A-State, a Pennsylvania

Corporation with its principal place of business in New Jersey, was able to exploit a loophole[2] in this web by creating a computer network between its agents in every lottery state and transmitting its customer's lottery ticket orders over that network. Pic-A-State's operation enabled its customers to legally purchase a chance in any lottery in the nation. Because Pic-A-State's operation potentially affected each state's stream of lottery

---

[2]The loophole allowed an entity engaged in this business to operate as follows:

! Purchaser(s) in State A would "contract" with the local Pic-A-State outlet for the purchase of lottery ticket from State B.

! Purchaser(s) gives Pic-A-State numbers, the cost of the ticket(s) and commission (service charge), and receives claim checks for the actual lottery tickets.

! Pic-A-State, acting as an agent for Purchaser(s) gathers all orders for State B lottery tickets on a computer disk and transmits the contents of the disk to a Pic-A-State agent in State B.

! Pic-A-State wires the purchase money for the tickets to its agent in State B.

! Pic-A-State's agent in State B fills out the official playslips and buys the lottery tickets using money form Pic-A-State's clients in State A.

! Pic-A-State's agent in State B holds the lottery tickets in State B, they never cross state lines.

If purchaser wins he claims the prize in accordance with the local lottery commission's rules. This mode of operation ensured the lottery paper never left the state, the mails were not used, and a wire facility was not used for ordering lottery tickets, hence no violation of federal law. When done correctly, the purchase transactions are totally transparent to the local lottery commission's selling agent and because all local state lottery codes and rules are followed, there were no violations of state law that could render a winning ticket invalid.

3

revenues[3] and prevented each state from maintaining exclusive control over its lottery, the states lobbied Congress to close this loophole by amending the code.[4]  On September 13, 1994, Congress enacted the Interstate Wagering Amendment as part of the "Violent Crime Control and Law Enforcement Act of 1994".  This amendment closed the loophole through which Pic-A-State was operating by revising 18 U.S.C. §§ 1084, 1301, and 1953.

Pic-A-State promptly challenged the constitutionality of the Interstate Wagering Amendment in the Federal District Court for the Middle District of Pennsylvania (Pennsylvania Court).  Pic-A-State also sought to enjoin the enforcement of the revised code sections until the merits of its challenge could be heard.  Because, it met the dual burdens of showing irreparable harm and the probability of

---

[3]From the state's standpoint, the main effect of this industry was to place each of the state's lotteries in competition with each other.  This was done by shifting lottery ticket revenue from a customer's state whose prizes were relatively small to a competing state whose lottery prizes had grown large because of jackpot roll-overs.  From a player's perspective, it was far more attractive to purchase a chance in the lottery that has the larger prize.

A roll-over occurs when no winner emerges from the preceding drawing.  In many state lotteries, the jackpot is combined with the next game's jackpot and so on until a winner is drawn.

[4]The states wanting to further exploit their lottery monopolies by entering into multi-state compacts offering multi-state games did not want competition from Pic-A-State. Further, the states realized that direct control of a Pic-A-State type of operation was either beyond their individual powers or that the resultant state codes would likely be unwieldy and potentially unenforceable thereby reducing flexibility for the states and the players. We note this to illustrate the difficulty that the states would have in trying to eliminate Pic-A-State with their own regulations.  Because the district court did not reach the merits of these defenses neither do we.

success on the merits the Pennsylvania Court enjoined the Department of Justice (DOJ) from enforcing revised code sections against Pic-A-State.

In November 1994, while the injunction was in effect, Scott Wenner bought two Texas Lottery tickets for face value plus a one-dollar per ticket service charge from a Pic-A-State outlet in Croyden, Pennsylvania. One of Wenner's tickets matched all six numbers drawn by the TLC, entitling Wenner to the grand prize of $10,000,000. Wenner promptly claimed his prize. In January, 1995, the TLC refused to honor Wenner's claim alleging violations of both federal and Texas law.

In February 1995, the Pennsylvania Court denied Pic-A-State's constitutional challenge to the Interstate Wagering Amendment and dissolved the injunction. The Third Circuit affirmed and Pic-A-State ultimately dissolved.

Wenner filed suit in the Southern District of Texas seeking a declaratory judgment that his winning ticket was valid and an order enforcing the contract arising therefrom. BDM Enterprises, which sold the actual lottery ticket, intervened seeking its one-percent seller's bonus. The TLC raised a number of defenses, most notably: 1)Wenner purchased his ticket in violation of the Interstate Wagering Amendment; 2) Wenner purchased his ticket in violation of various sections of the Texas Lottery Code; and 3) Wenner's claim against the TLC was barred by sovereign immunity.[5] Both parties

---

[5]We include the sovereign immunity defense only for the sake of completeness. The magistrate judge disallowed the TLC's attempt to raise this defense in an amended pleading and the district court

5

moved for summary judgment.

The district court granted summary judgment in favor of the TLC. It reasoned that, despite the pendency of the injunction, Wenner's purchase of the ticket through Pic-A-State violated the Interstate Wagering Amendment and therefore the resulting contract was unenforceable. We disagree with the district court and therefore reverse and remand.

## II. DISCUSSION

This Court reviews the district court's grant of summary judgment *de novo*. *Melton v. Teachers Insurance & Annuity Assoc. of America,* 114 F.3d 557, 559 (5th Cir.1997) (citations omitted). We view the evidence in the light most favorable to the non-movant in applying the same standard as the district court. *Hibernia Nat'l. Bank v. Carner,* 997 F.2d 94, 97 (5th Cir.1993). Summary judgment shall be granted if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. Fed.R.Civ.P. 56(a). The party seeking summary

issued the summary judgment on other grounds before reconsideration. The TLC raised this defense in its appellate brief claiming a "de facto" pleading of sovereign immunity. It offers no authority for the propriety of such a pleading practice, nor could we find authority for it in the Federal Rules of Civil Procedure or the case law. The district court, however, never reached this defense and neither do we.

> We also take this opportunity to point out that the TLC's appellate brief was wholly inadequate. The TLC appears to have done little more than plagiarize the district court's thoughtful and well written opinion and as such never addressed the points Wenner raised on appeal.

6

judgment has the initial burden of showing that there is an absence of any genuine issue of material fact. *Celotex v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). The burden then shifts to the non-moving party who must show the existence of a genuine issue of material fact. *Id.* It is incumbent on the non-moving party to bring forth facts and not merely rest on denials nor rely on the allegations within its pleadings. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 256-57, 106 S.Ct. 2505, 2514-15, 91 L.Ed.2d 202 (1986).

Consequently, a summary judgment will be vacated only if the evidence viewed in the light most favorable to the non-movant shows a genuine issue of material fact or the moving party is not entitled to judgment as a matter of law. *Catrett,* 477 U.S. at 323, 106 S.Ct. at 2553.

The dispositive issue in this case is whether the TLC was entitled to judgment as a matter of law. There is no dispute as to the material facts. The district court held that the TLC was entitled to a judgment as a matter of law reasoning that the contract arising from Wenner's ticket is unenforceable because the purchase of the ticket violated federal law. *See Southwestern Underground Supply & Envtl. Serv., Inc. v. Amerivac, Inc.,* 894 S.W.2d 15, 18 (Tex.App.-Tyler 1982). The court reasoned that, "[A]n applicant, which procured a wrongful issuance of the temporary injunction, [cannot] claim to be absolved of its illegal activity committed during the pendency of the wrongfully issued injunction." In granting the TLC's motion for summary judgment,

the district court reasoned that, "A *wrongfully issued* preliminary injunction restraining temporarily the prosecution of a penal statute does not render the statute itself invalid or "not in force', ...." (emphasis added).  We disagree because:  1) the Pennsylvania court issued the injunction in conformance with the law of the Third Circuit and is therefore, presumptively correct;[6] and 2) a legally issued injunction froze the status quo which existed prior to the enactment of the Interstate Wagering Amendment of the Violent Crime Control and Law Enforcement Act of 1994 therefore, maintaining the legality of Pic-A-State's activities performed while the injunction was in effect.  Accordingly, the contract arising from the ticket purchase was not unenforceable because of an illegality, the TLC was not entitled to a judgment as a matter of law, and therefore, the summary judgment must be vacated.

*A. Injunction*

The district court has traditionally had the equitable power to fashion any remedy necessary and appropriate to do justice in a particular case.  *Hecht v. Bowles,* 321 U.S. 321, 329, 64 S.Ct. 587, 591, 88 L.Ed. 754 (1943).  "The essence of equity jurisdiction has been the power of the chancellor to do equity and to mould each decree to the necessities of the particular case.  Flexibility rather than rigidity have distinguished it.  The qualities of mercy and practicality have made equity the instrument for nice

_____

[6]There is no evidence in the record that the DOJ overcame or could overcome that presumption.

adjustment and reconciliation between public interest and private needs...." *Id.*

The district court in contemplation of exercising its traditional equitable powers must weigh several factors to determine whether a party's request for equitable relief should be granted. *Id.* Among the factors that must be considered are: 1) the probability of irreparable damage to the moving party in the absence of relief; 2) the possibility of harm to the non-moving party if relief is granted; 3) the likelihood of success on the merits; and 4) the public interest. *United States v. Price,* 688 F.2d 204, 211 (3rd Cir.1982); *accord A.O. Smith Corp. v. F.T.C.,* 530 F.2d 515, 525-26 (3rd Cir.1976).

On September 16, 1994, the Pennsylvania Court issued a TRO barring the DOJ from enforcing revised code sections against Pic-A-State. The court issued the order after Pic-A-State made a showing of irreparable harm to its business and probable success on the merits. Ten days later, the Pennsylvania Court, after hearing the DOJ's motion to vacate and finding the circumstances and equities unchanged, issued a preliminary injunction continuing the ban against the DOJ's enforcement of the revised code sections against Pic-A-State, its agents and employees until the challenge could be heard on its merits.

In issuing a temporary injunction, the Pennsylvania District Court specifically found that: 1) a denial of the equitable relief sought by Pic-A-State would result in irreparable damage to Pic-A-State's business; and 2) Pic-A-State was likely to succeed on the

merits. It is important to note that the immediate harm asserted by Pic-A-State would have resulted from having to suspend its business to avoid criminal prosecution while awaiting the adjudication of its constitutional challenge to the Wagering Amendment.[7] We infer from the record, that because the loophole had existed for over ninety (90) years and the DOJ did not demonstrate to the court that it would be harmed by the injunction, that there was no harm to the non-moving party.[8]

Even though Pic-A-State made a credible showing that it would suffer irreparable harm in the absence of the injunction and it was likely to prevail on the merits, the Pennsylvania Court was required to consider the "public interest" before issuing the injunction. *Price,* 688 at 211.[9] The record indicates that Pennsylvania Court was fully aware of what type of business Pic-A-State was operating. More particularly, the court knew Pic-A-

---

[7]The Pennsylvania Court noted that, in the absence of the injunction Pic-A-State's business would likely have suffered irreparable damage even if it prevailed on its challenge to the amendment. The reason Pic-A-State sought the injunction was that the revised code provisions placed Pic-A-State in the position that to protect its business, it had to continue operating while waiting for the court to decide the merits of its challenge. By operating, Pic-A-State risked criminal prosecution under the revised code sections in the event its challenge was unsuccessful. Alternatively, Pic-A-State could have shutdown to avoid the risk of criminal prosecution but, it very likely would have lost its business even if it prevailed on the constitutional challenge. The essential purpose of an injunction is relieve this type of dilemma.

[8]This explains why the Pennsylvania Court required no bond be posted by Pic-A-State.

[9]We further note that the TLC voiced no objection to accepting proceeds from Pic-A-State agents located in Texas for non winning lottery tickets.

State's customers were from the general public. It is clear to us that the public interest would hardly be served if Pic-A-State were allowed to transact business during the pendency of the injunction and its unsuspecting customers were denied the right to collect any benefit therefrom. We cannot believe the Pennsylvania Court, when deciding whether to issue the injunction, would have ignored something so obvious.

We also think it is significant that the DOJ made no further motions to lift the injunction and did not appeal the injunction to the Third Circuit. The Third Circuit considers a number of factors in reviewing the grant or denial of a preliminary injunction. Two of the factors which most pertinent to this case are: 1) the law has conferred power to grant or dissolve an injunction to the discretion of the trial court and not to the appellate court; 2) unless the trial court abuses its discretion, commits an obvious error in applying the law, or makes a serious mistake in considering the proof, the appellate court must take the judgment of the trial court as presumptively correct.[10] *A.O. Smith,* 530 F.2d at 525.

In short, we find nothing in the record to indicate that the injunction issued by the Pennsylvania Court was in any way wrongful. We also do not attach any significance to the fact that

---

[10]We note this only to point out that the government, having failed to show it would be harmed at the district court, likely could not make the requisite showing of obvious error or abuse of discretion to overcome the presumption the injunction was correctly issued. *A.O. Smith Corp. v. F.T.C.,* 530 F.2d 515, 525 (3rd Cir.1976).

Pic-A-State did not ultimately prevail on the merits of its claim. The propriety of this injunction is determined by the circumstances in existence at the time it was issued, not after Pic-A-State's challenge was decided on the merits.

We are thus bound by the principles of comity and full faith and credit to respect the Pennsylvania Court's decision to issue the injunction and must conclude the injunction was correctly and legally issued. It is therefore, not within the authority of the Federal District Court for the Southern District of Texas or this Court to revisit the issue of whether the injunction was properly issued and conclude to the contrary.

B. Effect of the Injunction

It is well settled that the issuance of a prohibitory injunction freezes the status quo, and is intended "to preserve the relative positions of the parties until a trial on the merits can be held." *University of Texas v. Camenisch,* 451 U.S. 390, 395, 101 S.Ct. 1830, 1834, 68 L.Ed.2d 175 (1981). Preliminary injunctions commonly favor the status quo and seek to maintain things in their initial condition so far as possible until after a full hearing permits final relief to be fashioned. *Id.; Opticians Assoc. of Am. v. Independent Opticians of Am.,* 920 F.2d 187, 197 (3rd Cir.1990) (citations omitted). It follows that a district court issuing a temporary injunction upon the dissolution of a preliminary restraining order is acting to preserve the status quo. In this case, we have no doubt that Pic-A-State sought to maintain the status quo existing prior to the enactment of the Interstate

12

Wagering Amendment[11] of the "Violent Crime Control and Law Enforcement Act of 1994".

There is no dispute that before Congress enacted the Violent Crime Control and Law Enforcement Act of 1994, Pick-A-State was a legal corporation, operating a legal business in over thirty states. Pic-A-State's operation enabled its customers to buy chances in the lotteries from the various lottery states without violating federal law. In light of the fact that Congress' enactment of Interstate Wagering Amendment would have outlawed Pic-A-State's business, it is obvious that Pic-A-State sought to preserve the pre-enactment status quo until the merits of its constitutional challenge to the amendment could be heard.

Therefore, it is our opinion that: the injunction suspended the Interstate Wagering Amendment as applied to Pic-A-State; Pic-A-State's operations under the injunction were legal; and that obligations arising from Pic-A-State's operation are not unenforceable because of the Interstate Wagering Amendment of the "Violent Crime Control and Law Enforcement Act of 1994".

Finally, in summary, we find it incredible that the TLC urges us to adopt a position that sanctions the TLC's receipt of proceeds for the sale of its lottery tickets through Pic-A-State, and yet find that the TLC has no obligation to those unsuspecting patrons who provided it with such a benefit. For reasons already stated, Pic-A-State legally operated under the protection of the injunction and thus, had the right to collect fees for the service it

---

[11]18 U.S.C. § 1301 et al. as amended.

13

provided.  Pic-A-State benefitted by maintaining its business until its constitutional challenge to the Interstate Wagering Amendment could be heard.  The TLC benefitted insofar as it received proceeds from the sales of its lottery tickets through Pic-A-State operations in all lottery states for the six months the injunction was effective.  It may have also benefitted from not paying Wenner's claim.[12]  Under the TLC's position, only the unsuspecting and unknowing Pic-A-State patrons, who paid the bill for the TLC's and Pic-A-State's benefits, should be denied any chance to benefit.[13] We cannot subscribe to this wholly inequitable position.

In light of the foregoing, we conclude that the TLC was not entitled to a summary judgment as a matter of law and therefore, was not entitled to a summary judgment under Fed.R.Civ.P. 56(a).  Accordingly, we vacate the district court's summary judgment and remand for further proceedings consistent with this opinion.  VACATED AND REMANDED.

_____

[12]A perplexing question remains;  What happened to the $10,000,000 jackpot that is the subject of this suit?  Does the TLC still have it or was it rolled over into another jackpot?  Since Wenner's ticket was undisputedly a winning ticket, did the TLC begin a new game with a minimum prize jackpot?  The record gives no indication and the TLC's counsel was unable to provide any insight.  Perhaps the trial court can sort this out on remand.  We point out that the TLC may have accrued a considerable benefit by holding a prize of this magnitude or it may have earned a substantial benefit from additional ticket sales if the jackpot was eventually rolled over.

[13]The TLC argued that while Pic-A-State was operating under the injunction, it had a duty to post a disclaimer that in effect notified its patrons that winning tickets would be unenforceable because of the Interstate Wagering Amendment.  We find no authority for the proposition that a party who obtained an injunction to protect its interests while litigating its claim must then destroy its own interests through a such a self-inflicted wound.

14